2025 WL 2254239
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

Elena Lyadina SAVILLE, Plaintiff-Appellant,
v.
Clarence William WEBB, Robert Allen Whitworth, Randy Clarence Hopper, Billy Dale Mull, Randall Gene Mull, et al., Defendants-Appellees.

No. 24-10998
|
Non-Argument Calendar
|
Filed: 08/07/2025

Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 2:22-cv-00105-SCJ

**Attorneys and Law Firms**

Elena Lyadina Saville, Clarkesville, GA, Pro Se.

Jason C. Waymire, Williams & Waymire, LLC, Buford, GA, for Defendants-Appellees.

Clarence William Webb, Clarkesville, GA, Pro Se.

Robert Allen Whitworth, Alto, GA, Pro Se.

Randy Clarence Hopper, Clarkesville, GA, Pro Se.

Billy Dale Mull, Clarkesville, GA, Pro Se.

Randall Gene Mull, Alto, GA, Pro Se.

Before Jordan, Luck, and Wilson, Circuit Judges.

**Opinion**

PER CURIAM:

***1** Plaintiff-Appellant Elena Saville, proceeding pro se, appeals the district court's dismissal of her amended complaint alleging a Racketeer Influenced and Corrupt Organization Act (RICO) claim against her neighbor, Clarence Webb, who owns and operates a scrap metal recycling business on his property; a RICO conspiracy claim against Webb, his employees, and two local government officials; 42 U.S.C. § 1983 claims against Habersham County, a local judge, and prosecutor; and state-law claims.

After careful review, we vacate the district court's dismissal of Saville's § 1983 claim against Habersham County based on her claim the County's public comment policy deprived her of her First Amendment rights. Because one of Saville's federal claims was improperly dismissed, we also vacate the district court's decision not to exercise supplemental jurisdiction over her state-law claims. We remand for further proceedings on these claims. But we affirm as to all the remaining issues.

## I. Factual Background [1]

Saville owned property located across a narrow drive from Webb's Recycling. Since 2006, Webb operated the business without a business license and in violation of Habersham County's land-use ordinances, which did not permit recycling businesses in low-intensity residential areas. In 2012, Webb obtained a business license using his middle name to hide his prior criminal history. Saville also alleged that Webb's Recycling continuously violated federal environmental law and was not registered with the Georgia Sheriff's Association, as required by state law, until 2019. From 2006 to 2018, "dozens of neighbors" filed complaints with Habersham Code Enforcement about the scrapyard's operations.

More than 100 criminal cases have been filed in Habersham Courts against Webb's five employees. The employees regularly violated traffic laws on the road leading to the scrap yard, such as driving cars without a registration plate or with a covered plate and parking cars in inappropriate places. From 2017 to 2022, Saville complained about Webb's scrapyard operations to Code Enforcement, the Sheriff, and other county officials.

On May 3, 2017, Webb and his son-in-law visited Saville's property and demanded a $80,000 "ransom" payment, although Saville did not explain the purpose of the requested payment. After Saville refused to pay, Webb's employees and associates began a "campaign of intimidation" against her. On April 23, 2018, Webb filed his first application for Saville's criminal arrest for stalking. At a hearing on the application Habersham Magistrate Court Chief Judge Johnson prohibited Saville from taking pictures of Webb's

business and employees and ordering her to take down security cameras installed on her property. But Webb's application was later dismissed because there was not probable cause to issue an arrest warrant.

***2** The Habersham County Board of Commissioners scheduled a hearing for November 19, 2018, to determine whether to revoke Webb Recycling's business license, and Saville planned to attend. But Saville could not attend the hearing. Earlier that month, Webb filed a second, identical application for Saville's criminal arrest for stalking, which Magistrate Judge Thomas granted on November 13, 2018. This time, Saville was detained. Solicitor William Oliver brought criminal charges against Saville, and she was released on bail with conditions prohibiting her from contacting Webb directly or indirectly. This prevented her from attending the November 19, 2018, license-revocation hearing.

According to the minutes, during the November 19 license-revocation hearing for Webb's Recycling, Michael Beecham, the director of the planning department, reported that the neighbors had complained about trash in the yard. In January 2019, the Board of Commissioners granted Webb a conditional business license, which Saville contended was based on false information and issued because no one spoke against it at the hearing. She also alleged Sheriff Joey Terrell provided the business with a certificate falsely attesting that the business was properly registered with the Georgia Sheriffs' Association.

At other meetings before the Habersham County Board of Commissioners, the Chairman of the Board demanded that criticism about individual county staff members be handled through the internal channels and not through a public forum. On August 16, 2021, the Board considered a presentation by the chief magistrate judge to expand the court's authority. Saville spoke during public comment and accused the judge of mishandling evidence. She was interrupted and forcefully escorted from the podium. She also asserted that the time limits applied to public comments are not applied equally and are only strictly enforced against people who have unfavorable things to say.

Throughout this time, Webb and his employees threatened Saville with firearms, dogs, and vehicles. On February 2, 2020, Saville heard shooting from behind Webb's property, and his employee, Randy Hopper, carried a rifle from the scrap yard to another property in view of Saville's home. On December 20, 2020, Webb or one of his employees brought a German Sheppard dog to the scrap yard and induced it to attack Saville on her porch. The dog chased Saville and forced her to hide inside her house. On January 31, 2021, the dog attacked Saville again. Saville reported the incident to animal enforcement. Habersham County fined Webb's associate for violating animal control regulations but later suspended the fine for compliance. The same dog attacked Saville for a third time on February 2, 2022.

## II. Procedural History

In June 2022, Saville sued (1) Webb; (2) four employees of Webb's Recycling: Hopper, Robert Whitworth, Billy Mull, and Randall Mull; (3) Habersham County, Georgia; (4) Planning Department Director Beecham; (5) Sheriff Terrell; (6) Judge Thomas; and (7) Solicitor Oliver. Saville alleged that Webb had been operating an illegal scrap yard, he and his employees had threatened her to thwart her from reporting their illegal activity, and county officials enabled and assisted Webb's operation.

In an amended complaint,[2] Saville named the same defendants and raised: (1) a state and federal RICO claim against Webb; (2) a state and federal RICO conspiracy claim against Webb, his employees, Planning Director Beecham, and Sheriff Terrell; (3) a state-law claim for damages caused by gang activity against Webb and his employees; (4) a state-law malicious prosecution claim against Webb; and (5) a § 1983 claim against Habersham County, Judge Thomas, Solicitor Oliver, and Webb.

***3** In Count 1, Saville alleged that Webb operated an enterprise consisting of a network of scrap yards in Habersham County. She argued that the enterprise operated in violation of federal and state environmental laws and county ordinances. Saville argued that Webb's enterprise relied on a pattern of racketeering activity, including the following predicate acts: filing three applications for Saville's arrest (Acts 1, 2, and 5), submitting false statements to the planning department two times (Acts 3 and 4); and inducing a dog to attack Saville (Act 6). For Act 3, Saville specifically alleged that, on December 5, 2018, Webb applied for a conditional business license that falsely stated his legal

Goodmark, Leigh 9/3/2025
For Educational Use Only



name and property ownership information. For Act 4, she alleged that, on December 11, 2018, he submitted a letter of intent that "falsely claimed that [the Environmental Protection Agency (EPA)] did not find any environmental violations" at Webb's Recycling, despite violations issued by the Georgia Environmental Protection Division.

In Count 2, Saville raised a federal and state RICO conspiracy claim against Webb, his employees, Planning Director Beecham, and Sheriff Terrell, alleging that they conspired to further the criminal enterprise described in Count 1. Saville identified several predicate acts, including witness retaliation, threatened murder, and wire fraud. Counts 3 and 4 of the amended complaint alleged violations of state law.

Count 5 raised a § 1983 claim against Habersham County, Judge Thomas, Solicitor Oliver, and Webb. First, against Habersham County, she argued that Habersham County's official policy [3] limiting public comments at the Board of Commissioner's meetings imposed impermissible content-based limitations on speech by prohibiting "improper conduct." She also argued that Habersham County should be liable for Judge Johnson's actions during the May 8, 2018, hearing on Webb's first petition for her arrest. And she alleged that Habersham County should be liable for its animal control employees, who assisted Webb's group by allowing repeated dog attacks against Saville. Saville contended that Planning Director Beecham and Habersham County's issuing business licenses to Webb's Recycling allowed the business to violate her constitutional rights. Finally, she argued that Sheriff Terrell, by failing to stop the business's unlawful activity, caused her to be deprived of her Fourth Amendment right to be secure in her person, home, and property.

Next, Saville argued that Judge Thomas violated her First Amendment right to petition the government for redress of grievances by ordering Saville not to contact law enforcement. She argued that Judge Thomas was acting outside her judicial capacity because magistrate court judges, when considering an application for an arrest warrant, lack the authority to enter an injunction. Saville also argued that Judge Thomas and Webb conspired to prevent her from speaking at the license-revocation hearing, in violation of her right to petition the government for redress of grievances.

Saville argued that Solicitor Oliver deprived her of (1) her right to petition by criminally charging her for reporting violations to the sheriff and code enforcement and (2) her Fourteenth Amendment right to due process and equal protection by keeping her on bail for nearly three years without a trial. She argued that Oliver should not be granted prosecutorial immunity because he acted under a conflict of interest and was essentially acting as a private attorney for Webb's enterprise.

***4** Habersham County, Planning Director Beecham, Sheriff Terrell, Judge Thomas, and Solicitor Oliver (collectively, the Habersham County Defendants) moved to dismiss Saville's amended complaint, arguing that Saville's amended complaint failed to state a claim. Six days after the deadline, Webb filed a pro se motion to dismiss. Webb's employees filed nothing in response to Saville's amended complaint. Saville responded and sought leave "to service supplemental pleading" to add events that had taken place since her initial complaint in June 2022.

The district court granted the motions to dismiss, dismissed all claims against the Habersham County Defendants, Webb, and Webb's employees, and denied Saville's motion for a supplemental pleading. In a footnote, the court noted that it would consider Webb's motion to dismiss despite its untimeliness and his previously filed answer because of the leniency afforded to pro se litigants and because failure to state a claim was a "non-waivable defect."

As for Saville's federal RICO claims, the court found that she did not allege predicate acts that constituted racketeering activity under the federal RICO statute nor did she state a claim for RICO conspiracy using those predicate acts. On the § 1983 claims, the district court found that the claim against Webb failed because Saville did not allege anything beyond conclusory allegations to show that he was acting in concert with the government. For her claims against Habersham County, the court found that her free-speech claim was due to be dismissed because she did not show that her constitutional rights were violated by a policy or custom. The court found that Saville had not alleged that Habersham County had a custom or policy of knowingly issuing improper business licenses or allowing its animal control officers to knowingly disregard violations.

As for the claim against Judge Thomas, the court found that the judge was entitled to absolute judicial immunity because the complained of acts were squarely within the judge's judicial capacity. Similarly, the court found that Saville's claim against Solicitor Oliver was barred by prosecutorial immunity because the complained of actions were done in his role as county solicitor general.

Because Saville's federal claims were due to be dismissed, the district court declined to exercise supplemental jurisdiction over her state-law claims. As for Saville's motion to supplement the amended complaint, the court found that the supplemental allegations failed to state a claim. Because the amendment would be futile, the motion for supplemental pleading was denied. Saville timely appealed.

### III. Motion to Dismiss

The district court dismissed Saville's amended complaint, which alleged RICO, RICO conspiracy, and § 1983 claims against Webb, his employees, government officials, and Habersham County.

"We review the district court's grant of a motion to dismiss for failure to state a claim *de novo*, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). A sua sponte dismissal for failure to state a claim is reviewed de novo. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007).

We liberally construe pro se pleadings. *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014). That "leniency does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." *Id.* at 1168–69.

***5** To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face."[4] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Saville argues that the district court erred in dismissing her RICO claim against Webb and her RICO conspiracy claim against Webb, his employees, and local government officials because she adequately alleged predicate offenses that formed a pattern of racketeering activity. She also argues that the court erred in dismissing her § 1983 claim against Habersham County because she adequately alleged the existence of policies or customs that resulted in the deprivation of her constitutional rights. And she argues that her § 1983 claims against a judge and prosecutor should not have been dismissed because they were not protected by absolute immunity, and her § 1983 claim against Webb should proceed because he was conspiring with state actors. We will address each argument in turn.

#### *A. Substantive RICO Claim*

Saville argues that she sufficiently alleged predicate acts, including extortion, fraud, and threats, that constituted racketeering activity to state a RICO claim against Webb.[5] She asserts that she complied with the heightened pleading standard for fraud allegations.

To state a civil RICO claim, a private plaintiff must plausibly allege that "the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020). "[R]acketeering activity" is any indictable act under a list of criminal offenses enumerated in 18 U.S.C. § 1961(1), as well as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance." 18 U.S.C. § 1961(1). "A plaintiff must put forward enough facts with respect to each predicate act to make it independently indictable as a crime." *Cisneros*, 972 F.3d at 1215.

***6** "Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with" the "increased level of

specificity" required by Federal Rule of Civil Procedure 9(b). *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007). Rule 9(b) requires plaintiffs to plead allegations of fraud "with particularity." Fed R. Civ. P. 9(b). "Plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (per curiam).

Saville alleged the following predicate acts: [6] (1) witness retaliation in violation of 18 U.S.C. § 1513(b); (2) fraud in connection with identification documents in violation of 18 U.S.C. § 1028; and (3) wire fraud in violation of 18 U.S.C. § 1343.

To support the predicate act of witness retaliation, Saville asserts that she provided sufficient factual allegations about Webb inducing a dog to attack Saville on her porch. A person illegally retaliates against a witness when he knowingly "causes bodily injury to another person or damages the tangible property of another person, or threatens to do so" with the intent to retaliate against that person for giving information about a possible federal crime to a law enforcement officer. 18 U.S.C. § 1513(b)(2).

Construing Saville's complaint liberally, she adequately alleges that the dog chased her and forced her to hide inside her house, causing her to feel threatened and intimidated. But Saville did not offer any details about how Webb "induced" the dog, nor did she allege any facts, beyond her own belief, to support the inference that the incident with the dog was in retaliation for Saville reporting Webb to law enforcement. [7] Thus, Saville failed to establish the predicate act of witness retaliation based on the alleged dog attack.

To support the predicate act of fraud in connection with identification documents, Saville asserts that she provided sufficient factual allegations that Webb applied for a conditional business license under a "falsified legal name." To be guilty of fraud in connection with identification documents, the person must knowingly use, without lawful authority, "a means of identification of *another* person ... in connection with, any unlawful activity." 18 U.S.C. § 1028(a)(7) (emphasis added).

***7** Saville alleges that Webb used his own middle name—William—to apply for a business license. This is not enough to support a reasonable inference that Webb used the name of another person. *See Ashcroft*, 556 U.S. at 678. Because Saville asserted only in a conclusory manner that Saville used a false name for an unlawful reason, she fails to plead her allegations of fraud with particularity. *Brooks*, 116 F.3d at 1380–81. Thus, Saville failed to establish the predicate act of fraud in connection with identification documents based on Webb's business license using a false name.

To support the predicate act of wire fraud, Saville asserts that she adequately alleged wire fraud, and the district court failed to consider that her wire fraud allegations were part of a broader predicate act—Webb's use of fraudulent means to obtain a business license. To be guilty of wire fraud, the person "(1) intentionally participates in a scheme to defraud another of money or property and (2) uses the wires to further that scheme." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1196 (11th Cir. 2025) (internal quotation marks omitted); *see also* 18 U.S.C. § 1343. The phrase "money or property" is key, meaning "[a] defendant commits federal wire fraud ... only if he both engaged in deception and had money or property as an object of his fraud." *Kousisis v. United States*, 145 S. Ct. 1382, 1390 (2025) (internal quotation marks omitted).

Saville alleges that Webb committed wire fraud based on (1) his business license application and (2) a letter of intent in which he allegedly misrepresented his environmental record. But Saville fails to explain how these statements were part of a scheme to gain "money or property" from a victim, or who that victim might be. *Kousisis*, 145 S. Ct. at 1390. Again, Saville fails to allege fraud with particularity because she does not provide what Webb "gained by the alleged fraud," nor explain what the purpose of the letter of the intent was. *Brooks*, 116 F.3d at 1380–81. Thus, Saville failed to establish the predicate act of wire fraud with Webb's business application and the letter of intent.

The district court did not err in granting Webb's pro se motion to dismiss Saville's RICO claim because she failed to adequately allege predicate acts constituting racketeering activity.

*B. RICO Conspiracy Claim*

Saville argues that she has adequately alleged Webb, his employees, Planning Director Beecham, and Sheriff Terrell agreed to commit two predicate acts, specifically witness retaliation, threatened murder, and wire fraud.

It is "unlawful for any person to conspire to violate" 18 U.S.C. § 1962(c). 18 U.S.C. § 1962(d). "[A] bare assertion of conspiracy will not suffice to prove a RICO conspiracy." *Otto Candies*, 137 F.4th at 1201 (quotation marks omitted). A plaintiff may establish a conspiracy either by (1) "showing that the defendant agreed to the overall objective of the conspiracy"; or (2) "showing that the defendant agreed to commit two predicate acts." *Id.*

For witness retaliation, Saville points to: (1) Webb and Whitworth conspiring to testify falsely at the May 8, 2018, hearing on Webb's petition for Saville's arrest, (2) Webb and Whitworth doing the same at a June 12, 2018, hearing, (3) Webb and Hopper conspiring to testify falsely at a November 13, 2018, hearing, (4) Webb and Hopper conspiring to threaten Saville with a gun, (5) Webb and Billy Mull conspiring to testify falsely at a July 22, 2020, hearing, and (6) Sheriff Terrell knowingly and willfully failing to enforce traffic law against Webb's employees and associates when, on March 15, 2022, Webb, with Sherrif Terrell's assistance, drove his truck down the wrong lane and caused a collision with Saville's car.

***8** As noted, a person illegally retaliates against a witness when he knowingly "causes bodily injury to another person or damages the tangible property of another person, or threatens to do so." 18 U.S.C. § 1513(b). Testifying, even falsely, does not cause damage to tangible property nor bodily injury. To survive a motion to dismiss based on failure to state a claim, Saville needs to allege that testifying falsely amounted to threats to cause bodily injury or damage property. *See id.* But Saville did not specify what statements were made, so she has failed to state a claim for RICO conspiracy based on these predicate acts.

Turning to the claim that Webb and his employee, Hopper, threatened Saville with a gun, Saville alleged that she heard gun shots from behind Webb's property, and she then saw Hopper carrying a shotgun from Webb's Recycling to another property on the same street. While carrying a shotgun could be seen as threat, Saville does not allege that Hopper knew Saville was home, he walked toward her property, or that there was any interaction other than seeing Hopper walking down the street to another property "fully visible" from Saville's home. This amounts to "unwarranted deductions of facts" and does not support a claim for witness retaliation. *Oxford Asset Mgmt.*, 297 F.3d at 1188. Thus, Saville has failed to state a claim for RICO conspiracy based on the predicate act.

Turning to Sheriff Terrell's failure to enforce traffic laws, Saville only offers conclusory allegations about Sheriff Terrell's involvement in the traffic accident in March 2022, which cannot meet her burden. *Ashcroft*, 556 U.S. at 679. Thus, Saville has failed to state a claim for RICO conspiracy based on the predicate act.

For wire fraud, Saville alleges: (1) Planning Director Beecham knowingly hid damaging information about Webb's business from the Board of Commissioners at the November 19, 2018, license-revocation hearing; (2) Webb and Planning Director Beecham conspired to produce two illegal business licenses; and (3) Planning Director Beecham allowed records of Webb's business to be made "unsearchable" in the county database of business licenses. Although Saville provides factual details, she does not show that the challenged acts were part of a scheme to defraud her or someone else of their money and property, and the amended complaint does not allow the reasonable inference that Webb and Planning Director Beecham agreed to violate the law. *See Brooks*, 116 F.3d at 1380–81; *see also Kousisis*, 145 S. Ct. at 1390; *Otto Candies*, 137 F.4th at 1201. Saville has thus failed to state a claim for RICO conspiracy based on wire fraud.

So, the district court did not err in dismissing Saville's RICO conspiracy claim because she failed to adequately allege facts showing that the defendants agreed to commit predicate acts constituting racketeering activity. [8]

*C. Section 1983 Claims*

***9** Next, Saville argues that the district court erred in dismissing her 42 U.S.C. § 1983 claims against Habersham

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

County, Judge Thomas, Solicitor Oliver, and Webb. Section 1983 provides a private cause of action to sue persons acting under color of law for the deprivation of constitutional rights. *Crocker v. Hakes*, 616 F.2d 237, 239–40 (5th Cir. 1980) (per curiam).[9] A plaintiff cannot state a § 1983 claim based on alleged violations of state or local law unless she demonstrates the violation affected her constitutional rights. *See id.* We address each defendant's actions in turn.

i. Habersham County

Saville argues that she adequately alleged the existence of policies or customs by Habersham County that resulted in the deprivation of her constitutional rights.

A municipality cannot be held liable under § 1983 for the actions of its employees under a respondeat superior theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a municipality can only be held liable for its official policies. *Id.* Thus, to state a claim against a municipality, Saville must show Habersham County's action was based on an official policy or "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1131 (11th Cir. 2021) (quotation marks omitted). Saville has identified Habersham County Board of Commissioners' public comment policy and attached a copy of the policy to her amended complaint.

Next, Saville must show that a county policy or custom caused the violation of her constitutional rights. *Id.* Saville asserts Habersham County public comment policy violated her First Amendment rights because the policy imposes content-based limitations on speech at public meetings.[10]

Under the First Amendment, public meetings, such as Habersham County Board of Commissioners meetings, are typically considered limited public forums because they are created "for certain groups or for the discussion of certain topics." *McDonough v. Garcia*, 116 F.4th 1319, 1324 (11th Cir. 2024) (en banc) (quotation marks omitted). In such meetings, the government may limit speech so long as the regulations do "not discriminate against speech on the basis of viewpoint" and are "reasonable in light of the purpose served by the forum." *Id.* at 1329 (quotation marks omitted). But "[r]estrictions that bar offensive or otherwise unwelcome speech are impermissible, regardless of the forum in which the government seeks to impose them." *Moms for Liberty-Brevard Cnty. v. Brevard Pub. Sch.*, 118 F.4th 1324, 1334 (11th Cir. 2024).

The question is whether the Habersham County Board of Commissioners' public comment policy discriminates based on viewpoint and is reasonable. We find that policy, which prohibits comments that are "impertinent, derogatory, offensive, or slanderous," discriminates based on viewpoint. *See id.* at 1334–35; *see also Matal v. Tam*, 582 U.S. 218, 243 (2017) ("Giving offense is a viewpoint."). Thus, the district court[11] erred in dismissing Saville's § 1983 claim against Habersham County based on its public comment policy because she adequately alleged the existence of a county policy that caused her to be deprived of her constitutional right to free speech.

***10** Next, Saville argues that Habersham County allowed Judge Johnson to infringe on her First Amendment right to petition the government for redress of grievances when it enjoined her from taking photos of Webb's alleged criminal activity or reporting it to law enforcement. Thus, Saville asserts that Habersham County is liable for Judge Johnson's acts.

But Habersham County may be held liable under § 1983 "only for acts for which it is actually responsible, acts which the local government has officially sanctioned or ordered." *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (en banc) (citation modified). To determine whether a local government is liable under § 1983, a court must determine whether the actor responsible for the allegedly unconstitutional action was acting as a local government actor or a "policymaker" when he engaged in those activities. *Id.* If the actor was acting as an "arm of the State," then Eleventh Amendment immunity bars relief. *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc). To determine whether an official acts as an "arm of the State," we consider "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id.* at 1309.

The question becomes whether Judge Johnson is a local government actor or an "arm of the State." First, Georgia's state constitution vests "[t]he judicial power of the state" in several kinds of courts, including magistrate courts. Ga. Const. art. VI, § 1, ¶ I. Second, the state constitution, prohibits counties from taking any "[a]ction affecting any court or the personnel thereof," which are instead regulated by the state legislature. *Id.* art. IX, § 2, ¶ I. Third, the county pays for magistrate courts, but Georgia sets salaries for magistrate judges. O.C.G.A. § 15-10-23(a)(2), (d), (g). Finally, counties are not liable for judgments against magistrate court judges. *Id*. § 36-1-4. Thus, the magistrate judge is an arm of the state —not a county policymaker. *See Manders*, 338 F.3d at 1319 (finding that even though the county funded a sheriff's office, Georgia state law mandated it, so the sheriff was an arm of the state). Because Judge Johnson was not a county policymaker, Habersham County could not be held liable, and the district court did not err in dismissing that claim.

Finally, Saville asserts that Habersham County is liable based on its policy or custom of deliberate indifference to constitutional violations because its judges, prosecutors, and sheriffs allowed dog attacks and issued improper business licenses to Webb. But Saville does not have "a judicially cognizable interest" in Webb's "prosecution or nonprosecution." *Smith v. Shook*, 237 F.3d 1322, 1324 (11th Cir. 2001) (per curiam) (quotation marks omitted). And Saville cannot base her claim on Habersham County's alleged failure to enforce its zoning and animal control regulations because she has not shown that this nonenforcement violated any of her constitutional rights. *Crocker*, 616 F.2d at 240. Thus, the district court did not err in dismissing the rest of Saville's § 1983 claims against Habersham County.

ii. Judge Thomas and Solicitor Oliver

Saville also argues that the district court erred when it found that Judge Thomas and Solicitor Oliver were entitled to absolute immunity on her § 1983 claims because the complained-of actions were done in their role either as judge or prosecutor. [12]

***11** First, Saville argues that Judge Thomas is not entitled to judicial immunity. According to Saville, Judge Thomas enjoined her from contacting law enforcement to report alleged unlawful activity by Webb and from contacting Webb directly or indirectly. Saville contends that this "injunction" was outside the normal judicial function and exceeded magistrate authority under Georgia law.

"Judges are entitled to absolute judicial immunity from damages for those acts taken while they are acting in their judicial capacity unless they acted in the clear absence of all jurisdiction." *Bolin v. Story*, 225 F.3d 1234, 1239 (11th Cir. 2000) (per curiam) (internal quotation marks omitted). To determine whether a judge was acting in his or her "judicial capacity," we consider whether

> (1) the precise act complained of is a normal judicial function; (2) the events involved occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the confrontation arose directly and immediately out of a visit to the judge in his official capacity.

*Dykes v. Hosemann*, 776 F.2d 942, 946 (11th Cir. 1985) (per curiam) (citation modified).

Even though Saville uses the term "injunction" to describe what Judge Thomas did, Saville's factual allegations about the hearing show that Judge Thomas was setting bail conditions for Saville, not issuing an injunction. [13] Judge Thomas acted in her judicial capacity because issuing an arrest warrant and setting bail conditions are normal judicial functions, and setting the bail conditions occurred during a hearing and concerned a petition for arrest that was properly pending before her. *See Dykes*, 776 F.2d at 946.

Saville also argues that Judge Thomas exceeded the authority of a magistrate judge in issuing the injunction. Under Georgia law, magistrate courts have jurisdiction over "applications for and the issuance of arrest and search warrants," among other matters, including setting bond conditions. O.C.G.A. § 15-10-2(a)(1), (a)(2). Magistrate courts do not have jurisdiction over suits in equity. *See id.* § 15-10-2. But Judge Thomas did not issue an injunction, instead she set bail conditions which falls within magistrate courts' powers. [14]

Goodmark, Leigh 9/3/2025
For Educational Use Only



*Id.* § 15-10-2(a)(2). Thus, the district court did not err in dismissing Saville's claims against Judge Thomas. [15]

***12** Turning to Solicitor Oliver, Saville argues that Oliver is not shielded by prosecutorial immunity because he acted under a "grave" conflict of interest when he criminally charged her for reporting violations to the Sheriff and Code Enforcement. Saville also asserts that Oliver violated her Fourteenth Amendment right to due process and equal protection by keeping her on bail for nearly three years without a trial.

Prosecutors are absolutely immune from liability for damages for activities that are intimately associated with the judicial phase of the criminal process. *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976). Prosecutorial immunity extends to all actions that the prosecutor takes while performing her role as an advocate for the government, including the initiation and pursuit of criminal prosecution, all appearances before the court, examining witnesses, and presenting evidence. *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 (11th Cir. 2002). Absolute immunity can cover "even wrongful or malicious acts by prosecutors." *Hart v. Hodges*, 587 F.3d 1288, 1298 (11th Cir. 2009) (per curiam).

Oliver's initiation and pursuit of Saville's criminal prosecution is part of his role as an advocate for the government and thus entitles him to prosecutorial immunity. *See Rowe*, 279 F.3d at 1279. Even though Saville asserts that Oliver conspired with Webb to prosecute her for malevolent reasons, our case law still provides absolute immunity for these acts. *See Hart*, 587 F.3d at 1298. Thus, the district court did not err in dismissing Saville's claims against Solicitor Oliver because they were protected by absolute immunity. [16]

### iii. Webb

Saville argues that her § 1983 claim against Webb should proceed because he was conspiring with state actors. Section 1983 only provides a remedy for acts performed "under color of law." A private party cannot be sued under § 1983 except for in the "rare circumstances" when the party can be viewed as a state actor. *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). Although Saville alleges that Webb conspired with state actors, she did not adequately allege that Webb was acting as a state actor. Thus, the district court also did not err in dismissing her § 1983 claim against Webb because he was not a state actor.

* * *

To recap, the district court erred in dismissing Saville's § 1983 claim against Habersham County based on its public comment policy because Saville adequately alleged the existence of a county policy that caused her to be deprived of her First Amendment right to free speech. But the district court did not err in dismissing the rest of her § 1983 claims against Habersham County, Judge Thomas, Solicitor Oliver, and Webb.

## IV. Supplemental Jurisdiction on State Law Claims

Saville also argues that the district court should have heard her state-law claims. A district court's decision not to exercise supplemental jurisdiction is reviewed for an abuse of discretion. *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738 (11th Cir. 2006).

***13** A district court has original subject matter jurisdiction over claims arising under federal law. 28 U.S.C. § 1331. A district court may exercise supplemental jurisdiction over state-law claims that "form part of the same case or controversy" as claims over which the district court has original jurisdiction. *Id.* § 1367(a). "Whenever a federal court has supplemental jurisdiction under section 1367(a), that jurisdiction should be exercised unless section 1367(b) or (c) applies." *Parker*, 468 F.3d at 743.

Because the district court erred in dismissing one of the claims over which it had original jurisdiction—Saville's First Amendment claim against Habersham County—it did not have the discretion to decline to exercise jurisdiction over the state-law claims under § 1367(c)(3). *See Parker*, 468 F.3d at 743. Thus, we vacate the district court's decision not to exercise supplemental jurisdiction and remand for further proceedings. [17]

## V. Motion to Amend

Next, Saville argues that she should have been allowed to amend her complaint to add new predicate acts, a new constitutional violation by Habersham County, and new allegations showing the prosecutor was not entitled to immunity.

A district court's denial of a motion to amend a complaint is reviewed for abuse of discretion, although the underlying legal conclusion of whether a particular amendment to the complaint would be futile is reviewed de novo. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

After review, we agree with the district court's thorough analysis of Saville's motion to supplement. The court correctly found that the allegations about new business licenses failed to assert the elements of a federal wire fraud violation. And the district court properly found that Saville's allegations about animal control releasing a trapped dog did not plausibly constitute any federal racketeering activity.

For Saville's claim against Habersham County related to the allegedly unconstitutional search, the court appropriately found that she did not allege that the search was in accordance with a custom or policy of Habersham County. For her claim against Habersham County for its adoption of a policy directing certain appeals to the Superior Court of Georgia, the district court correctly found that Saville did not have standing to challenge the policy because she failed to allege that she had appealed a decision under the new policy or otherwise been injured. As to her new allegations against Solicitor Oliver, the court properly found that his subsequent judgeship had no bearing on whether he was entitled to prosecutorial immunity for his actions prosecuting her.

Thus, the district court did not err in determining that Saville's amendment to her complaint would be futile because her new allegations would not save any of the claims that were properly dismissed.

## VI. Motion for Sanctions

Finally, Saville argues that the court should have imposed sanctions against the Habersham County Defendants because they threatened her by serving her with a motion for sanctions.

After filing her amended complaint, Saville moved for sanctions against the Habersham County Defendants under Federal Rule of Civil Procedure 11. She asserted that, on April 13, 2023, she received an email from the Habersham County Defendants' attorney, who attached a motion for sanctions against Saville. Saville argued that, because the motion for sanctions was never filed by the defendants, the email from their attorney constituted a private threat separate from the judicial process. She also argued that the defendants were misrepresenting the record by referring to a motion for sanctions that had not been filed, which was part of the defendants' pattern of falsifying records. The district court denied Saville's motion for sanctions, finding that the Habersham County Defendants did not behave improperly by sending her a letter warning it would seek sanctions because it was required under Rule 11.

***14** We review rulings on sanctions for abuse of discretion. *Didie v. Howes*, 988 F.2d 1097, 1103 (11th Cir. 1993). Under Rule 11, a party who believes that its opposing party has submitted a frivolous pleading may move for sanctions. *See* Fed. R. Civ. P. 11(b)(2), (c)(2). The motion must first be served to the opposing party, "but it must not be filed or be presented to the court if the challenged paper ... is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." *See id.* 11(c)(2).

Here, the Habersham County Defendants served Saville with a motion for sanctions as required under Rule 11 arguing that the claims in Saville's amended complaint were frivolous. Also, in accordance with Rule 11, the Habersham County Defendants did not simultaneously file anything with the court. Thus, they complied with the Rule 11 requirements, and the district court did not err in denying Saville's motion for sanctions because the defendants did not behave inappropriately.

## VII. Conclusion

In conclusion, we **VACATE** the district court's dismissal of Saville's § 1983 claim against Habersham County based on the public comment policy allegedly depriving her of her First Amendment rights. Because one of Saville's federal claims was not due to be dismissed, we also **VACATE** the district

court's decision not to exercise supplemental jurisdiction over her state-law claims. We **REMAND** for further proceedings on these claims. We **AFFIRM** as to all other issues. [18]

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 2254239

## Footnotes

1 These facts come from Saville's amended complaint. Because the district court dismissed the complaint, we must accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016).

2 Webb and his employees each filed pro se answers, in which they summarily denied the accusations. Habersham County, Planning Director Beecham, Sheriff Terrell, Judge Thomas, and Solicitor Oliver moved to dismiss the complaint, arguing that Saville failed to state a claim and that various immunities barred her claims. The district court granted the motion to dismiss but, because Saville was proceeding pro se, granted her leave to file an amended complaint.

3 Saville attached an excerpt from the Habersham County Board of Commissioner's March 2021 Rules of Procedure to her amended complaint. The rules stated that individuals wishing to speak during board meetings (1) must sign in; (2) are limited to three minutes, or five minutes if they sign up in advance; (3) are not permitted to enter into any discussion with board members without permission from the chair; and (4) are not allowed "to make impertinent, derogatory, offensive, or slanderous remarks."

4 Exhibits attached to a complaint may be considered on a Rule 12(b)(6) motion, as they are considered part of the complaint. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007). But a district court may not consider the contents of documents attached to earlier versions of the complaint but were not attached to the most recently amended complaint. *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).

5 Saville argues that the district court erred by granting Webb's pro se motion to dismiss because the filing was late, failed to state a basis for dismissal, and did not satisfy several technical requirements in the Federal Rule of Civil Procedure. But considering the leniency given to pro se litigants, Saville fails to show that the district court erred in granting Webb's pro se motion to dismiss despite its technical deficiencies. *See Castro v. United States*, 540 U.S. 375, 381–82 (2003) (explaining that courts have some leeway to recharacterize a pro se filing "to avoid inappropriately stringent application of formal labeling requirements").

6 On appeal, Saville mentions that she adequately alleged extortion by alleging that Webb demanded $80,000 on May 8, 2018, and that the purpose of his demand was "to eliminate neighbors as witnesses of his wrongful operations." But in her amended complaint, Saville did not list extortion as a predicate offense, nor did she connect the allegation to her RICO claim. While pro se litigants are given leniency, it does not allow the court "to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014).

7 Saville argues that she adequately alleged that Webb's dog physically attacked her, and Webb induced the attack, pointing to photos she attached to her initial complaint. Even though the court can consider exhibits to the complaint, the court cannot consider contents of documents attached to prior versions of a complaint

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

but not the operative complaint because the filing of an amended complaint makes the previous complaints became a “legal nullity.” *Hoefling*, 811 F.3d at 1277.

8 As we explained at note 5, *supra*, the district court did not err when it liberally construed and ruled on Webb's pro se motion to dismiss, despite its technical deficiencies. *See Castro*, 540 U.S. at 381–82.

Even though Webb's employees did not move to dismiss the claims against them, the district court did not err in sua sponte dismissing Saville's claims against Webb's employees. We have prohibited sua sponte dismissals for failure to state a claim where (1) “the defendant had not filed an answer and the plaintiff still had a right to amend h[er] complaint pursuant to Rule 15(a),” (2) “the plaintiff brought h[er] claim in good faith,” and (3) “the district court failed to provide the plaintiff with notice of its intent to dismiss or an opportunity to respond.” *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). While the district court did not find that Saville's action was brought in bad faith or expressly give her another opportunity to amend, Saville was on notice that the other defendants were arguing that she failed to state a claim, she had an opportunity to respond, and the dismissal was without prejudice. *See id.*

9 All decisions rendered by the Fifth Circuit before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

10 Saville has adequately alleged that she was injured by this policy because she alleged that, on August 16, 2021, while she was speaking during public comment, she was “induced to leave” the podium. *See Moms for Liberty-Brevard Cnty. v. Brevard Pub. Sch.*, 118 F.4th 1324, 1330 (11th Cir. 2024).

11 We note two things about Saville's First Amendment claim. First, the district court did not have the benefit of our decision in *Moms for Liberty-Brevard County v. Brevard Public School*, when it issued its order. Second, while the Habersham County Defendants argue that there may have been a legitimate reason that Saville was silenced, and while that may be true after discovery, at this stage we must accept all allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hunt*, 814 F.3d at 1221. Under that standard, Saville alleged that she was cut off from speaking at a public meeting because she expressed a viewpoint unflattering to Habersham County.

12 We review questions of immunity de novo. *Smith v. Shook*, 237 F.3d 1322, 1325 (11th Cir. 2001) (per curiam).

13 This is further supported by the state court order from that November 13, 2018, hearing. Although the order setting bail conditions in Saville's state court case is not included in the record before us, we may take judicial notice of this order. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 651–52 (11th Cir. 2020); Fed. R. Evid. 201(b)(2).

14 But even if Judge Thomas's prohibitions qualified as an injunction, she probably still enjoys judicial immunity. Acting “in excess of jurisdiction” is not enough to deprive a judge of absolute judicial immunity—the judge must act despite “the clear absence of all jurisdiction.” *Stump v. Sparkman*, 435 U.S. 349, 356 n.6 (1978). Because “the scope of the judge's jurisdiction must be construed broadly” in questions of judicial immunity, *id.* at 356, Judge Thomas's actions likely were not in “the clear absence of all jurisdiction.” *Id.* at 356 n.6.

15 In a conclusory fashion, Saville says that declaratory and injunctive relief is not covered by judicial immunity. Saville has abandoned this claim. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (“[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes [this court's] considering the issue on appeal.”).

Goodmark, Leigh 9/3/2025
For Educational Use Only



16 Saville also asserts that declaratory and injunctive relief is not covered by prosecutorial immunity. Unlike her argument against Judge Thomas, Saville provides more discussion to support her assertion. But Saville's allegations were about past events, and she did not allege facts showing a serious risk of continuing or future harm. Thus, the district court did not err in finding that Saville was not entitled to declaratory or injunctive relief. *See* *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000) (per curiam).

17 Although § 1367(c)(3) does not apply, the district court may decline to exercise supplemental jurisdiction over a state-law claim for other reasons under § 1367(c).

18 Saville also argues that the court erred in its order awarding payment of expenses to Saville because the court miscalculated the date payments were due. If a plaintiff requests waiver of service and a defendant, without good cause, fails to waive service, the court must impose on the defendant the expenses incurred in making service and reasonable expenses involved in a motion to collect those expenses. Fed. R. Civ. P. 4(d)(2). But Saville did not make any argument about the propriety of the order awarding payment of expenses below, so we will not address it on appeal. *See* *Wright v. Hanna Steel Corp.*, 270 F.3d 1336, 1342 (11th Cir. 2001).

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT B**

GREEN highlights indicate content recommended by District Administration
TAN highlights indicate conforming/editorial changes

COBB COUNTY SCHOOL DISTRICT

**BOARD OF EDUCATION POLICY**

## BCBI Public Participation in Board Meetings

~~1/20/22~~ **x/x/25**

**A. GENERAL PROVISON:**

1. Meetings of the Cobb County Board of Education (Board) are held to conduct the affairs and business of the school system. The public is invited to attend all meetings, with the exception of executive sessions, and citizens are invited to address the Board at appropriate times and in accordance with this policy.
2. Public comment opportunities are available for the Board to hear from interested members of the community. Board members do not provide responses or engage in direct conversation during public comment. If speakers wish to receive an answer to a specific question, inquiries should be directed to the appropriate district office.
3. Before addressing the Board, individuals are urged to seek a solution to their concerns through the proper staff and administrative channels.

**B. SPEAKER ELIGIBILITY:**

The Board will hear public commentary from any interested resident of Cobb County outside the City of Marietta; Cobb County School District (District) student or parent/guardian of a District student; non-resident owner of property within the geographic boundaries of the District; and/or employee of the District pursuant to the guidelines outlined in this Policy. Students under the age of 18 must be accompanied by the student's parent/guardian.

**C. PUBLIC COMMENT:**

The Board provides a 30-minute public comment session at each work session and voting session of monthly Board meetings to allow individuals, as identified in Section B of this Policy, an opportunity to address the Board.

**D. SCHEDULING:**

1. Speakers will have an allotted time of two minutes with the Chair having the discretion to limit the number of speakers speaking for or against an individual matter, with a maximum of 15 speakers.
2. Individuals desiring to appear before the Board must first complete a sign-in sheet which should be available 30 minutes prior to the convening of the Board meeting.
3. To allow the Board to receive input from as many stakeholders as possible, individuals may only address the board at either the work session or voting session of the monthly Board meeting.
4. Speaker information must contain:
   a. Name;
   b. Full physical address and no Post Office boxes. Cobb County property owners not residing in Cobb County must provide both their Cobb County property address as well as their mailing address;
   c. Telephone number;
   d. E-Mail address;
   e. Discussion topic and which, if any, Board agenda item is related to their topic;
   f. Whether they are a resident of Cobb County outside the City of Marietta; a District student or parent/guardian of a District student; a non-resident owner of property within the geographic boundaries of the District; and/or an employee of the District; and
   g. Whether or not they have materials to submit to the Board.

5. Speakers must present any materials brought for the Board, i.e., letters, photos, petitions, written comments, or other documentation, etc., to the designated District representative. Speakers are asked to provide ten (10) copies of these materials. The District representative shall provide a copy of these materials to each of the following:
    a. Each Board Member;
    b. Superintendent;
    c. Board attorney; and
    d. The District's records representative.

**E. SPEAKING:**

1. Speakers will be scheduled on a first come, first served basis. However, the Chair may give priority to those discussing Board agenda items being considered during the Board meeting.
2. Speakers may not gain an additional opportunity to speak by reserving or dividing their allotted time for another speaking occasion and may not pass their allotted time to other speakers.
3. An organization may sign up to speak by designating a duly authorized spokesperson and one alternate, who may speak only if the primary spokesperson is unable to attend. By signing up and by addressing the Board on behalf of an organization, a speaker is representing that he or she has been duly authorized by that organization to make the comments presented.

**F. CONTENT:**

1. Speakers must:
    a. State their name to the Board prior to beginning public commentary;
    b. End their remarks when their allotted time expires; and
    c. Direct public commentary to the Board as a body and not to an individual Board Member.
2. Individuals will not be denied the opportunity to address the Board on the basis of their viewpoint.
3. Speakers should be courteous and professional. The Board will not allow abusive language, threats, comments, jeers, applause, or shouts from the floor. Disruptive persons will be asked to leave the meeting room. The presiding Board officer may terminate public comments that are obscene, threatening, slanderous, profane, vulgar, or defamatory.
4. Speakers may comment on issues scheduled for consideration at the Board meeting or other concerns pertinent to the operation of a school or the District. In addition to the guidelines in this Policy, public commentary will not be permitted if:
    a. The topic is excluded by the Open Meetings Act (O.C.G.A. §§ 50-14-1 et seq.). (This includes, but may not be limited to, certain land, legal or personnel items);
    b. The speaker makes obscene, profane, vulgar, defamatory, slanderous, or threatening gestures/remarks during his/her public commentary;
    c. The speaker discusses a student by name, or shares other information that could lead to the personal identification of a student (See, for example, Family and Educational Rights Privacy Act, 20 U.S.C. § 1232g);
    d. The speaker makes ~~untrue~~ **tortious**, slanderous, or defamatory comments ~~or other unsubstantiated claims~~ about an identified or identifiable employee (~~While general comments are appropriate for the public comment session,~~ **C**oncerns about specific individuals should be addressed privately with the appropriate District administrator.); or
    e. The speaker disrupts or attempts to disrupt the Board meeting ~~(see, for example, O.C.G.A. § 16-11-34)~~.

**G. BROADCAST:**

Speakers should be aware that their public commentary may be ~~broadcast live,~~ filmed, photographed, or recorded by the District or other**s** ~~non-District media sources. The District may rebroadcast public commentary on COBB edTV or on the District or school websites. Any portion of the public commentary that is not in compliance with this Policy (such as prohibited in Section F. above) and/or applicable broadcast authority may be edited prior to broadcast~~.

**H. LIMITATIONS:**

Any person who willfully violates these guidelines may forfeit the remainder of their speaking time and the Board may, in consultation with the Board Attorney, issue a written notice prohibiting the speaker from appearing before the Board for ~~up to sixty (60) days~~ **a specific period of time as allowed by law**.

Approved: 10/11/78
Revised: 1/26/84; 8/8/84; 1/24/85; 4/28/88; 7/12/89; 7/8/92; 2/25/93; 9/13/95; 05/23/96; 8/22/96; 11/12/03
Re-Adopted: 4/11/07
Confirmed: 5/9/07
Revised: 7/23/09
Revised and Re-coded: 5/17/12 (previously coded as Board Policy BEDH)
Revised: 2/15/18; 6/10/21; 1/20/22**; x/x/25**

Legal Reference

| | |
|---|---|
| O.C.G.A. 16-11-34 | Preventing or disrupting a meeting of General Assembly or other meetings of members |
| O.C.G.A. 16-11-35 | Removal from campus or facility of unit of university system or school; failure to leave |
| O.C.G.A. 20-2-58 | Public Comment Period |
| O.C.G.A. 50-14-1 | Open Meetings Law |

EXHIBIT C

No reason for cutting video of public comment from Cobb school board meetings

Anytime an official uses efficiency as a justification for eliminating public input, I get suspicious.




Cobb County parent Melissa Hagen speaks at the July 2025 school board meeting against a plan to stop livestreaming public comments during their meetings. (Cobb County School District)

By Richard T. Griffiths

Aug 5, 2025

Sadly, it was something we won't see again: One by one the public speakers stood to deliver their allotted two minutes of remarks to the Cobb County Board of Education. Their universal concern? That the school system was about to vote to cut all public comment from the video feed of board meetings.

According to Superintendent Chris Ragsdale, the change of policy was his idea.

"My recommended changes to the policy will allow our board meetings to be more efficient and more focused on the business of students, teachers and our schools," Ragsdale told board members, "and will remove the liability associated with broadcast and public comments."

Anytime a public official starts using efficiency as a justification for eliminating public input, I get suspicious. Democracy is messy, complicated and sometimes deliberately inefficient.

It's difficult to see how stopping the broadcasting of public comments will make the board more efficient, except that, perhaps, the board now will be able to simply ignore the public speakers, since no one else will hear them.

Georgia law requires school boards to hold monthly meetings and to "provide a public comment period during such regular monthly meetings." School boards are the only government entities in Georgia required to do that. In 2004, Cobb County schools began broadcasting the school board meetings on a local cable TV channel. The meeting videos are also posted on the school board's website.

"The district has had to interrupt speakers and edit recordings, due to legal concerns, such as copyright infringement, intellectual property issues or tortious speech," Ragsdale said.

By Experience Columbia SC




Ragsdale got his way. The board voted 4-3 on July 17 to cut all public comment from the video feed.

To our Georgia First Amendment Foundation attorneys, the justifications for the vote don't pass any basic legal test.



Credit: Contributed

Richard T. Griffiths is a former president of the Georgia First Amendment Foundation. (Courtesy)

Under Georgia law it would be really hard to sue a school district for something a public speaker said. While commenters are potentially liable for what they say, government agencies are protected by sovereign immunity from such suits. The school board enjoys the same protection as Facebook for comments posted on its website. As to copyright violations, quoting from a book in a public meeting is a clear fair use under copyright law. And we couldn't find a single school system in Georgia that has ever been sued for statements made during public comments.

Perhaps the superintendent was embarrassed by the appearance of school bus maintenance workers at an April school board meeting, who spoke up to warn of antiquated buses that shouldn't be carrying children anymore, lack of up-to-date maintenance equipment and overworked employees.

"If any of these men makes one mistake, it can cost someone their life," warned one of the mechanics who spoke during the public comment period.

Several news organizations immediately picked up the comments from the video feed of the meeting and reported on them. At the time, school district officials told reporters it was

the first time they heard about the school bus problems. For journalists with limited resources to cover metro Atlanta's more than 20 school districts, the video feed of comments was a tool to help them cover the issues in Cobb County.

As any parent will tell you, keeping up with the issues — like safety of school buses — is really hard. For many busy parents, like Melissa Hagen who has three children, the comment period of the meeting was the best way to understand what is happening in their children's schools.

"When you stream public comments, you affirm that the voices of this community deserve to be heard, not just by the board, but by one another," Hagen told the board members.

"Real time access allows people to hear concerns unfiltered, to witness the tone and passion behind the words, and to participate in the civic life of this district, even if they can't physically be in this room."

Couldn't say it better. Proof of the value of public comments, publicly heard.

---

*Richard T. Griffiths is retired after a 43-year journalism career. He is an advocate for open government and a former president of the Georgia First Amendment Foundation.*

About the Author

Richard T. Griffiths