**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| JENNIFER PETERSON and MELISSA MARTEN, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | 1:24-CV-04998-ELR |
| COBB COUNTY SCHOOL DISTRICT, CHRIS RAGSDALE, individually and in his official capacity as Superintendent of Cobb County School District, and JOHN FLORESTA, JULIAN COCA, NAN KIEL, DANIEL VEHAR, ZACH ALDERSON, and AMANDA CHAMBERS, each individually and in his or her official capacity, | * * * * * * * * * * * * | |
| Defendants. | * * | |

_____

**ORDER**

_____

This matter is presently before the Court on the Joint Motion to Dismiss by

Defendant Cobb County School District (CCSD) and Co-Defendants Chris

Ragsdale, John Floresta, Julian Coca, Nan Kiel, Daniel Vehar, Zach Alderson, and

Amanda Chambers (collectively, "Individual Defendants"). [Doc. 8].[1] Also before the Court are Plaintiffs Jennifer Peterson and Melissa Marten's Motion for Preliminary Injunction ("PI Motion"), [Doc. 1-2], and Defendants' Motion for Leave to Respond to Plaintiffs' Untimely Notices of Supplemental Authority, [Doc. 21]. For the reasons discussed, the Court denies the Motions.[2]

I.      Background

This is an action alleging a violation of Plaintiffs' First Amendment rights by CCSD, CCSD Superintendent Chris Ragsdale, and several CCSD employees.[3] Plaintiffs, whose children attend CCSD schools, are members of the Cobb Community Care Coalition ("Coalition"), which is "a group of parents, students, [and] community members in Cobb County[, Georgia,] who believe the acceleration of racism, bigotry, and censorship in [CCSD] as well as the District's negligence

---

[1] All citations are to the electronic docket unless otherwise noted, and all page number references are to the page numbers imprinted by the Court's docketing software.

[2] Defendants seek leave to respond to Plaintiffs' two notices of supplemental authority, arguing that the notices are "impermissible, untimely sur-reply briefs." [Doc. 21 at 1]. The Court is able, however, to disregard a party's subjective characterizations of supplemental authority or any arguments asserted in notices of supplemental authority. Thus, no rebuttal from Defendants is required to the statements Plaintiffs include in the notices.

[3] The CCSD employees are (1) John Floresta, Chief Strategy & Accountability Officer; (2) Julian Coca, Director of Content and Marketing; (3) Nan Kiel, Press Relations Coordinator; (4) Daniel Vehar, Assistant Director of Marketing; (5) Zach Alderson, Communications Specialist; and (6) Amanda Chambers, Secretary for the Office of Communications. Compl. ¶¶ 5–10 [Doc. 1]. As previously noted, the Court refers to these employees, together with Chris Ragsdale, as "Individual Defendants."

around gun violence require a strong, coordinated resistance to demonstrate the power of the people to effect positive change." Compl. ¶¶ 1–2, ¶ 28, 9 n.1 [Doc. 1].

### *School Board's written public comment policy and "normal" sign-in process*

The Cobb County Board of Education ("School Board" or "Board") has a written policy on public participation in Board meetings ("Policy BCBI"). Policy BCBI, Compl. Ex. 1 [Doc. 1-1]. In accordance with Policy BCBI, the Board reserves 30 minutes for public comments during meetings. Compl. ¶ 17; Policy BCBI §§ B–C. Each public commentor has two minutes to speak, which allows for a maximum of 15 speakers. Policy BCBI § D.1. Members of the public who intend to speak during the public comment portion of a Board meeting must complete a sign-in sheet, which is made available 30 minutes before the meeting. Id. § D.2. Those who have successfully signed in are scheduled to speak on a "first come, first served basis." Id. § E.1. According to Policy BCBI, "[i]ndividuals will not be denied the opportunity to address the Board on the basis of their viewpoint." Id. § F.2.

Since 2020, the Board's normal procedure is to make the sign-in sheet available electronically, on computer tablets. Compl. ¶ 22. Excluding Board meetings during the COVID pandemic, the Board's normal procedure is to place, 30 minutes before a Board meeting, two tablets with the sign-in sheet on a sign-in table at the lobby reception desk of the School Board building. Id. ¶ 23.

### *Coalition members anticipate speaking at Board meeting*

The incident at issue occurred on September 14, 2023, when Coalition members, wearing red shirts with an anti-Ragsdale message, gathered at the Cobb County Board of Education ("School Board" or "Board") building ahead of the Board's 7:00 p.m. monthly meeting. Id. ¶¶ 25–29, 31.

Starting at around 3:30 p.m., Coalition members rallied to protest the School Board's decision to terminate teacher Katherine Rinderle's employment for reading the book *My Shadow is Purple* to her fifth-grade gifted class. Compl. ¶¶ 25–29, 31. Following that decision, CCSD and Superintendent Ragsdale made public comments supporting the removal of LGBTQ-themed books from CCSD schools and libraries, and Superintendent Ragsdale characterized opponents of the books' removal as "evil." Id. ¶¶ 26–27. The Coalition members migrated into the School Board building, intending to sign up for the public comment portion of the Board's monthly meeting. Id. ¶ 29. The members anticipated signing up at the "normal location," using the "normal process" Id.

### *Unannounced change in "normal" sign-in process*

As is sometimes the case with putative speakers at Board meetings, on September 14, 2023, Coalition members formed a line to complete thesheet hours ahead of the 7:00 pm Board meeting ("September Board Meeting" or "Meeting"). Compl. ¶¶ 24, 31. According to Plaintiffs, based on their instant message exchanges,

Individual Defendants knew that Coalition members occupied the first 15 places in the line, and they altered the normal sign-in process to prevent the Coalition from speaking. Id. ¶ 32.

Instead of placing the sign-in tablets at the lobby reception, at Superintendent Ragsdale's direction, Floresta, Chambers, and Coca ordered Vehar and Alderson to deliver the sign-in tablets outside the building. Compl. ¶ 33. The Coalition members in line inside the lobby scrambled outside to secure their place in the new sign-up line, and a physical altercation ensued. Id. ¶ 33. Plaintiffs lost their place in line, and they were replaced by speakers supporting Superintendent Ragsdale. Id. ¶ 34–35.

Because they were not the first 15 people to sign up, Plaintiffs were excluded from the September Board Meeting's public comment agenda and were not permitted to share their viewpoints at any time during the Meeting. Id. ¶¶ 35, 40. Instead, two pro-Ragsdale speakers, who had not been in the line inside the building and, thus, would not have been eligible to sign up if the Board had followed its normal procedure, were allowed to sign up and speak. Id. ¶¶ 38–39.

### *Plaintiffs' asserted claim*

Alleging the deprivation of their right to free speech, Plaintiffs assert a claim under 42 U.S.C. § 1983, seeking a declaration that Defendants' actions violated Plaintiffs' free speech rights, an injunction against Defendants' manipulation of the sign-in procedure, and an award of damages. Plaintiffs also move for a preliminary

injunction to "prevent Defendants from again intentionally manipulating sign-in procedures for public comment in order to limit viewpoints critical of [the School Board] and its policies." [Doc. 1-3 at 1]. Defendants oppose the preliminary injunction motion and request instead that the Court dismiss Plaintiffs' claim because, among other things, they have failed to plausibly allege a First Amendment violation. [Doc. 8-1 at 3]. Because it raises case-dispositive issues and is governed by a standard that is less exacting than the one Plaintiffs must meet for the PI Motion, the Court first considers Defendants' Motion to Dismiss and then turns to the PI Motion.

## II.    Motion to Dismiss

Defendants advance three reasons for their request that the Court dismiss Plaintiffs' claims. First, according to Defendants, Plaintiffs have failed to plausibly allege a First Amendment violation. [Doc. 8-1 at 14]. Second, Defendants argue, Plaintiffs identify no basis to hold CCSD liable for allegedly violating Plaintiffs' First Amendment rights. [Doc. 8-1 at 14–19]. Third, they maintain that qualified immunity shields Individual Defendants from personal liability. [Doc. 8-1 at 19–22]. Contrary to Defendants' first argument, the Complaint alleges facts that are sufficient to show that Plaintiffs were prevented from speaking at the September Board Meeting because of their viewpoint and, thus, plausibly alleges a First Amendment violation. Also, because Superintendent Ragsdale may serve as the final

policymaker regarding the sign-in process, Defendants' argument as to CCSD's liability for his alleged decision to move the sign-in location at the last-minute fails. Last, because Individual Defendants' alleged conduct violated a clearly established right, qualified immunity does not apply.

## A. Legal Standard

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, a defendant may move to dismiss the complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a 12(b)(6) motion to dismiss, the court must accept as true the allegations set forth in the complaint, drawing all reasonable inferences in the light most favorable to the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); United States v. Stricker, 524 F. App'x 500, 505 (11th Cir. 2013). Even so, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555); Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282–83 (11th Cir. 2007). Rather, "a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief" to satisfy "the pleading requirements of Rule 8." Parker v. Brush Wellman, Inc., 377 F. Supp. 2d 1290, 1294 (N.D. Ga. 2005) (citing Fed. R. Civ. P. 8(a)(2)).

Additionally, to survive a Rule 12(b)(6) motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Put differently, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This so-called "plausibility standard is not akin to a 'probability requirement'"; rather, the plaintiff must allege sufficient facts such that it is reasonable to expect that discovery will lead to evidence supporting the claim. Id. (quoting Twombly, 550 U.S. at 556).

## B.    Analysis

"First Amendment claims proceed in three steps." Dyer v. Atlanta Indep. Sch. Sys., 426 F. Supp. 3d 1350, 1358 (N.D. Ga. 2019). The court considers first whether the First Amendment protects the speech at issue. Id. If the speech is protected, the court next identifies the nature of the forum. Id. With the forum type identified, it "asks whether the justifications for exclusion from the relevant forum satisfy the requisite standard." Id. (cleaned up). "For purposes of this motion, Defendants concede that the First Amendment would have protected Plaintiffs' intended speech at the Board meeting, had they spoken." [Doc. 8-1 at 6]. And the Parties agree that the Board's public-comment session was a limited forum. [Id. at 7; Doc. 14 at 4]. In a limited public forum, the government is permitted to place certain restrictions on

speech. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799–800 (1985). However, those restrictions "must not discriminate against speech on the basis of viewpoint" and "must be reasonable in light of the purpose served by the forum." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106–07 (2001) (cleaned up).

### 1.    First Amendment violation

Plaintiffs maintain that Defendants unjustifiably prevented them from speaking at the September Board Meeting by manipulating the speaker selection criteria. A plaintiff can challenge a government policy facially, as applied, or both. A facial challenge seeks "to invalidate a statute or regulation itself" and aims to "vindicate [the plaintiff's] own rights . . . [and] also those of others who may be adversely impacted by the statute." DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1262 (11th Cir. 2007) (cleaned up). To succeed on a facial challenge in the First Amendment context, a plaintiff must show that the challenged law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." Moody v. NetChoice, LLC, 603 U.S. 707, 744 (2024) (cleaned up). Frankly, facial challenges are "disfavored" and even when "based on the First Amendment," they are "hard to win." Id. at 723, 744. In contrast, an as-applied challenge "addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party," Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308

9

(11th Cir. 2009) (cleaned up), and aims to "vindicate [the plaintiff's] own rights," DA Mortg., 486 F.3d at 1262.

Plaintiffs identify "two constitutional problems": (1) CCSD officials' "unbridled discretion" over the speaker sign-in process for public comment determining whether a person gets to speak and (2) an "abrupt and unnoticed change" in the sign-in process driven by "viewpoint discrimination." [Doc. 14 at 6–7]. A plaintiff may challenge a "scheme that allegedly vests *unbridled discretion* in a government official over whether to permit or deny expressive activity[.]" Tracy v. Fla. Atl. Univ. Bd. of Trustees, 980 F.3d 799, 809 (11th Cir. 2020) (emphasis added). Plaintiffs raise such a challenge here. They argue that CCSD officials have "unbridled discretion" to manipulate the sign-in provision because "there are no standards for the process of collecting sign-in by citizens for public comment." [Doc. 14 at 6]. Indeed, "the unbridled-discretion doctrine permits a facial challenge to a particular type of speech regulation—one that gives a government official the discretion whether to permit or forbid speech but lacks adequate standards to guide her decision." Huggins v. Sch. Dist. of Manatee Cnty., 151 F.4th 1268, 1281 (11th Cir. 2025). But here, although Policy BCBI's requirement that public commentors must sign-in determines who may speak at a Board meeting, Plaintiffs do not point to the Policy as vesting CCSD officials with unbridled discretion due to the Policy's lack of adequate standards governing the sign-in process. Indeed, Plaintiffs expressly

and unequivocally disavow a challenge to Policy BCBI. [See Docs. 14 at 1–2, (characterizing claim as an "as applied" challenge "focused narrowly on location switching of the sign-in location (an issue apart from the written policy)" and maintaining that "Plaintiffs do not challenge the written policy itself. While there may well be some problems with the policy facially, this lawsuit does not challenge that policy." (emphasis in original); id. at 4–5 (arguing that "Defendants' argument about the facial constitutionality of the written policy is completely irrelevant to the claims in this case")]. Especially in view of Plaintiffs' clear disavowal and their shallow treatment of the "unbridled discretion" argument, Plaintiffs have failed to develop this argument and the Court declines to credit it.

Plaintiffs' next argument, however, overcomes Defendants' position that the Complaint fails to viably plead a First Amendment violation. "[I]n a First Amendment case like this one—involving a limited public forum—the government's rules must be viewpoint neutral and reasonable." Moms for Liberty v. Brevard Pub. Sch., 118 F.4th 1324, 1333 (11th Cir. 2024). Plaintiffs argue that Defendants did not apply the sign-in process for public comment in a viewpoint-neutral or reasonable manner. The Board's normal procedure was "always to put out a sign-in tablet at the lobby reception desk thirty minutes before" a Board meeting. Compl. ¶ 23. But on September 14, 2023, although a line had already formed at the "normal [sign-in] location," Defendants switched the location

11

of the sign-in tablets at the last minute and delivered the tablets outside the building and away from where the sign-in line had formed. Id. ¶ 33. Defendants made this "abrupt and unnoticed change in the sign-up process that had been consistently carried out for years," [Doc. 14 at 7], because Defendants were aware that Coalition members, recognizable because they were wearing red shirts with an anti-Ragsdale message, occupied the first 15 positions in the line in the lobby, and they intended to exclude people with an anti-Ragsdale viewpoint from speaking, Compl. ¶¶ 29, 32–33, 36. That intent was realized because Plaintiffs, who were in the line that had formed in the lobby, lost their place when Defendants moved the sign-in location and were blocked from expressing their opposition to the Board's actions at the Meeting. Compl. ¶ 31, 34, 42. Instead, they were replaced by two supporters of the Board and Superintendent Ragsdale. Id. ¶ 38–39. As alleged, Defendants altered the sign-in process for public comment to prevent people with an anti-Ragsdale viewpoint from signing up and, thus, speaking at the September Board Meeting. In other words, viewing the facts in a light favorable to Plaintiffs, Defendants' alteration of the sign-in procedure for public comment was not viewpoint neutral. Plaintiffs plausibly allege that they were prevented from expressing a viewpoint critical of the Board in violation of the First Amendment.

2.    CCSD's liability for the violation

Under 42 U.S.C. § 1983, Plaintiffs seek to hold CCSD liable for the violation of Plaintiffs' free speech right. Here, Individual Defendants changed the sign-in procedure for the public comment process. However, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). It may, nevertheless, be held "responsible under § 1983" when the "execution of [the] government's policy or custom . . . inflicts the injury." Id. Thus, to assert liability against CCSD, Plaintiffs must "identify a municipal policy or custom that caused [their] injury." Grech v. Clayton Cty., 335 F.3d 1326, 1329 (11th Cir. 2003) (cleaned up). They may do so by alleging that the constitutional violation resulted from "either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." Id. Alternatively, "[i]n limited circumstances, a single decision by a municipal policymaker may be sufficient to impose liability under § 1983. However, municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Sweeting v. City of Atlanta, No. 22-CV-03185, 2023 WL 4672243, at *3 (N.D. Ga. July 20, 2023) (cleaned up). According to Plaintiffs, "the manipulation (without notice) of the sign-up procedures

for public comment" at the September Board Meeting represents a circumstance in which this single-decision theory applies. [Doc. 14 at 8].

The single-decision theory requires a plaintiff to show: "(1) acts which the municipality officially sanctioned or ordered; (2) acts of municipal officers with final policy-making authority as defined by state law; and (3) actions taken pursuant to a policy adopted by the official . . . responsible under state law for making policy in that area." Sweeting, 2023 WL 4672243, at *3. Defendants argue that Plaintiff cannot identify an act ordered by a CCSD official with final policymaking authority. [Doc. 8-1 at 17–18]. The Complaint identifies Superintendent Ragsdale as the final policymaker on the public comment sign-up process and alleges that his Chief of Staff, Floresta, participated in the group discussion to manipulate the sign-in process and that the sign-in location was moved at the Superintendent's direction. Compl. ¶¶ 5, 30, 33. But Defendants maintain that even if Superintendent Ragsdale directed that the sign-in tablets be placed outside the building, Plaintiffs cannot show that he was the final decisionmaker on the public comment procedures under Policy BCBI and, thus, they cannot establish that his act represented CCSD's official policy. [Id.] They argue that under O.C.G.A. § 20-2-61(a), it is the School Board's "role . . . to establish policy for the [Cobb County] school system and that the Superintendent's "role . . . is to implement the policy established" by the Board. [Doc. 8-1 at 18]. They contend that the Board's Policy BCBI governs public participation and comment at

Board meetings and assigns final decision-making authority over the process to the Board and its Chair. [Id.] Specifically, Defendants maintain that it is the Board that provides the 30-minute comment session under Policy BCBI and it is the Chair who prioritizes the speakers. [Id.]. Considering this, according to Defendants, the Superintendent has no final policymaking authority over the Board's public comment procedure under Policy BCBI. [Id.]

As Defendants acknowledge, however, school superintendents can act as final policymakers. [Doc. 8-1 at 18]. Indeed, "non-school board officials can, under certain circumstances, be considered final policymakers. This is likely especially true with superintendents, who act as 'executive officers' and are the 'alter ego' of the board, responsible for carrying out its policies." Williams v. Fulton Cnty. Sch. Dist., 181 F. Supp. 3d 1089, 1127 (N.D. Ga. 2016) (cleaned up). Whether Superintendent Ragsdale was a final policymaker for the public-comment sign-in procedure "is a question of law, but it depends intensely on the facts of the case, and requires consideration of both positive law and local custom." Id.

"[A] municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir. 1997). According to Defendants, "Policy BCBI and O.C.G.A. § 20-2-58 are the only sources of Georgia law or policy governing the public-comment sign-up process"

and because "[n]either references the superintendent," it cannot be that the Board delegated the operational details of the sign-up process to Superintendent Ragsdale, leaving no room for the Board to have the final say. [Doc. 17 at 15]. But the allegations support that very conclusion.

Superintendent Ragsdale's alleged decision to change the sign-in location without notice left no room for any meaningful administrative review. Approximately 30 minutes elapsed between the delivery of the sign-in tablets and the start of the September Board Meeting. See Compl. ¶¶ 31, 33. As soon as the sign-in tablets were delivered outside of the building, a new line started to form, with those people who had formed a line in the lobby scrambling to secure their place in the new line. See id., ¶ 33. The first 15 people in line at the new location to successfully sign in spoke at the Meeting. See id. ¶¶ 35, 38–39. This fast-evolving situation provided no opportunity for meaningful review of the Superintendent's alleged decision. In other words, there was no opportunity to unwind the clock. The change from the "normal" sign-in location prevented Plaintiffs from signing-up for public comment. And although two commenters used their comment time at the Meeting to complain about the location change, Plaintiffs were not allowed to speak during the public comment portion of the Meeting. Compl. ¶¶ 40–41. At this stage, crediting Plaintiffs' allegations as it must, the Court is persuaded that the Complaint pleads facts showing that Superintendent Ragsdale's alleged decision to change the

"normal" sign-in procedure for public comment was not subject to reasonable review. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1293 (11th Cir. 2004) (holding that, although the student handbook allowed for a multi-step review process, school principal who paddled student for gesturing in protest when his class recited the Pledge of Allegiance was final decisionmaker for the disciplinary action because where student "could not, as a practical matter, take advantage of" the review process and the punishment could not be undone by review after the fact, "there was no opportunity for meaningful review"). Accordingly, Defendants' argument that the § 1983 claim against CCSD should be dismissed for Plaintiffs' failure to plead an unconstitutional act by a final policymaker fails.

### 3.    Individual Defendants' qualified immunity

Defendants argue that Plaintiffs' effort to hold Individual Defendants personally liable for the alleged constitutional violation fails because these Defendants have qualified immunity from such claims. [Doc. 8-1 at 19–20]. Plaintiffs counter that qualified immunity does not shield Individual Defendants in this instance for their viewpoint-based restriction of Plaintiffs' speech. [Doc. 14 at 14–20].

"The [qualified immunity] doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established statutory or constitutional rights that a reasonable person would have

17

known about." Huggins, 151 F.4th at 1278. Here, the Parties agree that Individual Defendants were acting within the scope of their discretionary authority in performing the challenged conduct. [Docs. 8-1 at 19 n.2; 14 at 14]. Thus, Plaintiffs "must show that qualified immunity is not appropriate[, by establishing] that: (1) the government actor violated [their] constitutional or statutory right and (2) the unconstitutionality of that conduct was clearly established at the time of the violation." Hughes v. Locure, 166 F.4th 121, 127 (11th Cir. 2026) (cleaned up).

As to the first element, Plaintiffs plausibly allege that Individual Defendants acted in concert to prevent people expressing a specific viewpoint from speaking at the Board meeting. For instance, the Complaint alleges that Alderson, Chambers, Coca, Floresta, Kiel, Rauch, and Vehar participated in a Teams Messages Group commenting on the "turnout of the anti-Ragsdale group," were aware that Coalition members occupied the first 15 places in the line inside the lobby, and, at Superintendent Ragsdale's direction, changed the location of the sign-in tablets. Compl. at 10 n.2; ¶¶ 30, 32; Exs. 2–5 [Doc. 1-1 at 4–30]. Referencing a previous section of their brief, Defendants summarily argue that "Plaintiffs have not pled facts showing how each Individual Defendant violated their constitutional rights." [Doc. 8-1 at 20]. Although the section that Defendants reference contains argument on Plaintiffs' failure to allege a constitutional violation, it does not focus on the conduct

18

of any Individual Defendant but rather on Policy BCBI. [Doc. 8-1 at 6–14]. Thus, Defendants' argument does not move the needle.

And as to the second element, Plaintiffs may show that Defendants' conduct violated a clearly established right by:

> (1) by pointing to a materially similar decision of the Supreme Court, of [the Eleventh Circuit], or of the supreme court of the state in which the case arose; (2) by establishing that a broader, clearly established principle should control the novel facts of the case; or (3) by convincing [the court] that the case is one of those rare ones that fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary.

Hughes, 166 F.4th at 128 (cleaned up). Maintaining that there exists a "broader, clearly established principle" here, Plaintiffs argue that "[v]iewpoint-driven prior restraints on speech are so clearly unlawful that no reasonable government official could believe otherwise." [Doc. 14 at 16]. And because Defendants intentionally engaged in viewpoint-based discrimination, qualified immunity does not shield them. The Court agrees.

"One of the most egregious types of First Amendment violations is viewpoint-based discrimination." Holloman, 370 F.3d at 1279. Indeed, "[g]overnment actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place." Id. at 1280. In Holloman, the record supported a showing that the disciplining of a student by his teacher and his school principal

19

"was motivated by unconstitutional viewpoint discrimination." 370 F.3d at 1281–82. The Eleventh Circuit denied the teacher qualified immunity because "the right to be free from viewpoint discrimination" was previously "clearly established (both in general as well as in the public school context)[.]" Holloman, 370 F.3d a 1282.

"A principle of constitutional law can be 'clearly established' even if there are notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." Holloman, 370 F.3d at 1277 (cleaned up). Thus, the court "do[es] not just compare the facts of an instant case to prior cases to determine if a right is 'clearly established;' [it] also assess[es] whether the facts of the instant case fall within statements of general principle" from binding precedent. Id. at 1278. Here, the facts alleged do just that. Plaintiffs plausibly allege that Individual Defendants altered the public comment sign-in procedure to prevent people holding anti-Ragsdale views from speaking at the September Board Meeting. As alleged, Individual Defendants' actions represent intentional viewpoint-based discrimination. And a person's "right to be free from viewpoint discrimination," in general, is "clearly established." Holloman, 370 F.3d at 1282. Citing Holloman, the Eleventh Circuit recently reiterated this principle in Huggins, 151 F.4th at 1279 n.7. Noting that the plaintiff plausibly alleged that the school superintendent prevented him from speaking at a school board meeting because of his viewpoint, the Eleventh

Circuit reasoned that qualified immunity would not shield the superintendent from liability because "[t]he right to be free from viewpoint-based discrimination is a foundational—and long clearly established—constitutional right." Id. In sum, because the principle was clearly established before September 14, 2023, Individual Defendants had notice that their viewpoint-discrimination-motivated conduct was unconstitutional. Qualified immunity does not apply.

## III.    Motion for Preliminary Injunction

Pointing to Defendants' "viewpoint-silencing manipulation of the sign-in process" for public comment at the September Board Meeting, Plaintiffs request that the Court enjoin Defendants from engaging in any conduct that prevents Plaintiffs and others expressing views critical of the Board from signing up for public comment and from moving the sign-in location to silence critics. [Doc. 1-3].

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). Its "issuance . . . . is the exception rather than the rule." Barber v. Governor of Ala., 73 F.4th 1306, 1317 (11th Cir. 2023).

> To obtain the preliminary injunction [they] seek[], [Plaintiffs] must show that (1) [they] ha[ve] a substantial likelihood of success on the merits; (2) [they] will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest.

Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs., 161 F.4th 765, 781 (11th Cir. 2025) (cleaned up). "[E]ven if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). Thus, "proof of irreparable injury is an indispensable prerequisite to a preliminary injunction," and it is Plaintiffs' "burden to show[] at least a substantial likelihood of irreparable injury." Id. at 1179. "An injury is irreparable if it cannot be undone through monetary remedies." Jackson v. Jones, No. 26-CV-782, 2026 WL 561148, at *7 (N.D. Ga. Feb. 27, 2026) (cleaned up). In addition to being irreparable, the injury must also be imminent. Siegel, 234 F.3d at 1176 (11th Cir. 2000) ("[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." (cleaned up)).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). And Plaintiffs allege that they suffered this irreparable injury. But to justify the prospective relief that a preliminary injunction affords, they must also show that they are in *imminent danger* of suffering a First Amendment violation. Elend v. Basham, 471 F.3d 1199, 1207 (11th Cir. 2006) ("The binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be

imminent."). In the First Amendment context, irreparable injury is presumed where there is "an imminent likelihood that pure speech will be chilled or prevented altogether." Siegel, 234 F.3d at 1178.

The record, however, fails to establish such an imminent likelihood. Plaintiffs point to no evidence indicating that Defendants are likely to prevent them from speaking at a future Board meeting. Indeed, Plaintiffs have signed up for public comment since the September Board Meeting. Coca Decl. ¶ 15 [Doc. 11-3]. Moreover, following the Meeting, the Board moved the sign-in location to a side-entrance, and it posts signs designating that area for prospective speakers to form a line to secure their place for the sign-in process. Id. ¶ 13; Floresta Decl. ¶12. Under these facts, Plaintiffs fail to show that Defendants' conduct has chilled their speech or that they continue to encounter efforts preventing them from speaking at Board meetings. Rather, they speculate that because the change in the Board's sign-in process is not in any written policy, it does not foreclose Defendants from repeating their viewpoint-discriminatory conduct. [Doc. 16 at 15]. But Plaintiffs cannot carry their burden to show that there is a substantial and imminent likelihood of an irreparable injury based on conjecture. And in the absence of a showing of imminent irreparable injury, a preliminary injunction is improper.

23

## IV.    Conclusion

For the reasons set forth above, the Court **DENIES** Defendants' Joint Motion to Dismiss, [Doc. 8], Defendants' Motion for Leave to Respond to Plaintiffs' Untimely Notices of Supplemental Authority, [Doc. 21], and Plaintiffs' Motion for Preliminary Injunction, [Doc. 1-2]. Defendants shall file their Answer to Plaintiffs' Complaint within **30 DAYS** of the entry of this order.

**SO ORDERED**, this 27th day of March, 2026.

Eleanor L. Ross
United States District Judge
Northern District of Georgia