**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JENNIFER PETERSON and MELISSA MARTEN,<br><br>Plaintiffs,<br><br>v.<br><br>COBB COUNTY SCHOOL DISTRICT; CHRIS RAGSDALE, in his individual and official capacity as Superintendent of Cobb County School District; JOHN FLORESTA, individually and in his official capacity; JULIAN COCA, individually and in his official capacity; NAN KIEL, individually and in her official capacity; DANIEL VEHAR, individually and in his official capacity; ZACH ALDERSON, individually and in his official capacity; AMANDA CHAMBERS, individually and in her official capacity,<br><br>Defendants. | Civil Action No. 1:24-cv-04998-ELR |

**DEFENDANTS' MOTION TO STAY PROCEEDINGS**
**AND SUPPORTING MEMORANDUM OF LAW**

All Defendants have appealed this Court's order denying their motion to dismiss. [Doc. 35.] Chris Ragsdale, John Floresta, Julian Coca, Nan Kiel, Daniel Vehar, Zach Alderson, and Amanda Chambers (collectively, the "Individual Defendants") have appealed the denial of their qualified immunity, which entitles them to a stay of all proceedings—including discovery and Rule 26(f) conferences—

pending resolution of their appeal. The Cobb County School District ("CCSD") has appealed the denial of its motion to dismiss under the Eleventh Circuit's pendent appellate jurisdiction doctrine.

Granting a stay would preserve the Individual Defendants' qualified immunity defense and conserve judicial resources. On the other hand, allowing this case to proceed would create duplicative, piecemeal litigation and undermine the purpose of qualified immunity.

## I. STATEMENT OF FACTS.

Defendants moved to dismiss this action. [Doc. 8.] This Court denied that motion. [Doc. 26.] In doing so, the Court found that Plaintiffs had plausibly alleged that Defendants violated their First Amendment rights. [*Id.* at 9-12.] And the Court denied qualified immunity to the Individual Defendants. [*Id.* at 17-21.] The Court ordered Defendants to file their Answers within thirty days of March 27, 2026. [*Id.* at 24.]

On Friday, April 24, 2026, Defendants separately filed their Answers. [Docs. 27-34.] And they jointly filed a Notice of Appeal of the order denying their motion to dismiss. [Doc. 35.] The Individual Defendants have appealed the Court's denial of their qualified immunity defense under the collateral order doctrine. [*Id.* at 2.] And CCSD appealed the denial of its motion, invoking the Eleventh Circuit's pendent appellate jurisdiction. [*Id*. at 2-3.]

To protect the Individual Defendants' qualified immunity, preserve the parties' resources, and promote judicial efficiency, Defendants request a stay of proceedings until the appeal is fully resolved.

## II. MEMORANDUM OF LAW.

This Court should stay proceedings until the appeal is fully resolved, for two reasons. First, the Individual Defendants are entitled to a stay of proceedings pending resolution of their qualified immunity appeal. Second, that stay should also extend to CCSD, because continued litigation would undermine the purposes and benefits of the Individual Defendants' qualified immunity, which is an immunity from the burdens of litigation, not just a defense to liability.

### A. The Individual Defendants are entitled to a stay of proceedings because their qualified immunity appeal is non-frivolous.

"[The] driving force behind creation of qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials be resolved prior to discovery." *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009). Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability," the immunity is "effectively lost" if a district court allows the case to proceed to discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 526-527 (1985) (emphasis in original). Accordingly, "a stay of proceedings in the district court is required where a public official takes an interlocutory appeal to assert a non-frivolous claim to absolute or qualified immunity." *Summit Med. Assocs. v. James*, 998 F. Supp. 1339, 1342 (M.D.

Ala. 1998). And for the reasons discussed below, the Individual Defendants' interlocutory appeal of this Court's qualified immunity ruling is nonfrivolous.

As this Court correctly recognized, to overcome the Individual Defendants' qualified immunity, Plaintiffs had the burden of showing that each defendant "violated their constitutional or statutory right and (2) the unconstitutionality of that conduct was clearly established at the time of the violation." [Doc. 26 at 18 (cleaned up) (quoting *Hughes v. Locure*, 166 F.4th 121, 127 (11th Cir. 2026)).] But this Court strayed from that legal standard in three critical ways.

First, the Court improperly shifted the burden of the qualified immunity analysis from Plaintiffs to the Individual Defendants. Second, the Court denied qualified immunity in gross, without examining whether Plaintiffs had plausibly alleged that each Individual Defendant's alleged actions violated Plaintiffs' First Amendment rights. Third, the Court improperly denied qualified immunity based on law that was not "clearly established law" at the time of the alleged violation.

**i. The Court improperly shifted the burden to the Individual Defendants.**

Courts resolved qualified immunity using a burden-shifting framework. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). To show general entitlement to qualified immunity, the defendant must have been performing a "discretionary function." *Id.* If the defendant carries that initial burden, then the burden shifts back to the plaintiff to show that the defendant violated her

clearly established constitutional rights. *Id.* Since the parties' agreed that the Individual Defendants were performing discretionary functions [Doc. 26 at 18], the burden shifted to Plaintiffs, and the Individual Defendants argued that "Plaintiffs have not pled facts showing how each Individual Defendant violated their constitutional rights." [Doc. 8-1 at 20; *see* Doc. 26 at 18.] It was therefore Plaintiffs' burden to point to those factual allegations showing that each Individual Defendant had violated their clearly established free-speech rights.

But this Court instead shifted that burden to the Individual Defendants. According to this Court, the Individual Defendants' argument "[did] not focus on the conduct of any Individual Defendant but rather on Policy BCBI." [*Id.* at 18-19.] "Thus," this Court found, "Defendants' argument did not move the needle." [*Id.* at 19.] But it was not the Individual Defendants' job to "move the needle." That burden was Plaintiffs'.

**ii. The Court deprived each Individual Defendant of the individualized qualified immunity analysis each was entitled to.**

Under § 1983, a plaintiff cannot hold one government official vicariously liable for the constitutional violations of another. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). So to state a valid claim, the "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Id.* In the First Amendment context, the plaintiff must plead enough factual material to plausibly suggest that each official "acted with discriminatory

purpose." *Id.* That standard of culpability "requires more than intent as volition or intent was awareness of consequences." *Id.* (internal quotation marks omitted). So "to state a claim based on a violation of a clearly established right," the plaintiff "must plead sufficient factual matter to show that" the official undertook the challenged action "for the purpose of discriminating on account of" the plaintiff's viewpoint. *Id.*

As a corollary, "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). Courts "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions or omissions in which that particular defendant engaged." *Id.*

"That did not sufficiently occur here." *Id.* Though this Court denied the Individual Defendants "qualified immunity, it did not individually analyze [each official's] alleged actions before doing so." *Id.* The Court accepted Plaintiffs' argument that "Defendants altered the sign-in process for public comment to prevent people with anti-Ragsdale viewpoint from signing up and thus, speaking at the September Board Meeting." [Doc. 26 at 12.] But the Court did not examine the complaint's factual allegations as to each Individual Defendant.

At most, the Court relies on Plaintiffs' allegations relating to three, partially transcribed Teams chats. [*Id.* at 18; *see* Doc. 1 ¶¶ 30, 33, 36.] Superintendent

Ragsdale is a party to none of these chats. [*See generally* Doc. 1 ¶¶ 30, 33, 36.] Nan Kiel said, "The left side of the room looks a little thin today," and "Uh oh! There are some signs ready to support Ragsdale." [*Id.* ¶ 30.] Amanda Chambers, John Floresta, and Julian Coca commented on the comparative numbers of protesters and supporters present and how tense the atmosphere was during the sign-up process. [*Id.* ¶¶ 30, 33, 36.] Zach Alderson and Daniel Vehar, at the direction of their boss, delivered the sign-up laptop at 6:28. [*Id.* ¶ 33.]

Contrary to the Court's findings, these factual allegations do not plausibly suggest that the Individual Defendants "acted in concert to prevent people expressing a specific viewpoint from speaking at the Board meeting." [Doc. 26 at 18.] Based on the Teams messages, Plaintiffs allege that Ragsdale "directed" Floresta, Chambers, and Coca to "order[]" Vehar and Alderson to deliver the sign-up devices outside. [*Id.* ¶ 33.] But Plaintiffs allege no facts suggesting that Superintendent Ragsdale was present in the building lobby, knew of any attendees' political leanings, was monitoring who was "in line," or had any viewpoint-driven reason for directing the sign-up process to be moved outside. [*See generally id.* ¶¶ 4, 33.] So they have pled no facts suggesting his motives were viewpoint-driven.

Nor have they pled facts showing that the other Individual Defendants had such designs. Plaintiffs' only allegation against Kiel is that she made two comments in a Teams chat and shared a humorous .gif. [*Id.* ¶ 30.] How could Kiel have

anticipated that making a joke (itself a form of constitutionally protected speech) would somehow violate Plaintiffs' free-speech rights? The Court conducted none of this individualized analysis.

Nor did it do so for Vehar and Alderson, whose only sin was following their boss's directive to deliver the sign-up device outside. The Teams messages themselves show that Vehar and Alderson were not even present at board offices until shortly before the sign-up process began. [*See id.* ¶ 32 ("Daniel Vehar and Zachary Alderson when you get back see Amanda. . . .").] Did the First Amendment require Vehar and Alderson to refuse their boss's directive? If so, the Court examined no case or other legal authority saying so. Vehar and Alderson deserved that individualized analysis.

The remaining Individual Defendants received a similarly generalized analysis. At most, the Court noted Teams messages in which various CCSD officials (mostly within the Communications Department) commenting on the public optics of the protesters and supporters. There is nothing unusual about communications personnel making such observations; it is part of their job to notice such things. But it is unreasonable to infer, based solely on those Teams chats, that Floresta, Chambers, and Coca moved the sign-up process outside, just to frustrate Plaintiffs' efforts to sign up. The Court seems to have reached that determination based largely on the assumption that they were carrying out Superintendent Ragsdale's viewpoint-

driven agenda. But as discussed above, Plaintiffs pled no facts plausibly supporting that inference.

At bottom, the Court denied qualified immunity in gross, based on a poorly supported, conclusory allegation that the Individual Defendants were all "acting in concert" to suppress hostile viewpoints during the public comment session. Even at the pleading stage, each Individual Defendant deserved an individualized qualified immunity analysis. The Court should have scrutinized each Individual Defendant's alleged specific actions, determined whether those allegations plausibly supported an inference of viewpoint discrimination, and then determined whether the preexisting law clear enough to have alerted the Individual Defendants that they were crossing that constitutional threshold.

**iii. The Court denied qualified immunity based on law that was not "clearly established" at the time of the alleged violation.**

As discussed above, it is Plaintiffs' burden to point to legal authority showing that the unlawfulness of the Individual Defendants' alleged acts was "clearly established" at the time of the alleged violation. *Hughes*, 166 F.4th at 127. There are three ways a right can be "clearly established." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). First, the plaintiff may point to a "materially similar" case from the U.S. Supreme Court, Eleventh Circuit, or Georgia Supreme Court. *Id.* at 1208-10. Second, the plaintiff "point[s] to a broader, clearly established principle that should control the novel facts of the situation." *Id.* at 1208. Third, "the conduct

involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Id.*

The latter two methods are what the Eleventh Circuit calls the "obvious clarity" cases. *Id.* at 1209. These types of cases are exceedingly rare, especially in the First Amendment context. *Id.* at 1209-10. They "exist where the words of the federal statute or constitutional provision at issue are 'so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful,' or where the case law that does exist is so clear and broad (and 'not tied to particularized facts') that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* at 1209 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1350-51 (11th Cir. 2002)). Put another way, "the second and third paths are rarely-trod ones." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). As a result, plaintiffs usually cannot pierce qualified immunity unless they identify a materially similar, controlling case. *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1232 (11th Cir. 2020).

Yet this Court erroneously denied qualified immunity based on the broad, generalized principle that "viewpoint-driven prior restraints on speech are so clearly unlawful that no reasonable government official could believe otherwise." [Doc. 26 at 19.] That finding was erroneous for three reasons. First, it defined "clearly

established law" at too generalized of a level. Second, the Court erroneously invoked the "obvious clarity" methods for denying qualified immunity. Third, the Court erroneously relied on case law that post-dated the alleged violation by two years.

**a. The Court's formulation of "clearly established law" is too broad and generalized to overcome qualified immunity.**

To pierce qualified immunity, a plaintiff must show "that a reasonable person in the defendant's position would have been on notice that his actions violated clearly-established law." *Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000). The U.S. Supreme Court has consistently warned that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017). A general proposition cannot defeat qualified immunity unless it gives fair warning "to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). And as the Eleventh Circuit has explained, "It is particularly difficult to overcome the qualified immunity defense in the First Amendment context." *Gaines v. Wardynski*, 871 F.3d 1203, 1210 (11th Cir. 2017).

Despite this direction, the Court denied qualified immunity, reasoning that "a person's 'right to be free from viewpoint discrimination,' ***in general***, is 'clearly established.'" [Doc. 26 at 20 (emphasis added) (quoting *Holloman*, 370 F.3d at 1282).] But this abstract, admittedly "general" formulation of law is not

particularized to the facts of the case.

That matters because Plaintiffs' case is unique. There is no prior, controlling viewpoint-discrimination case that is materially similar. And nothing in the First Amendment spells out public-comment sign-up procedures at school board meetings. And though this Court found *Holloman ex rel. Holloman v. Harland* to be instructive, that case is so dissimilar that it provides little guidance. [Doc. 26 at 19-21.]

There, a school principal paddled a student because the student silently raised his fist during a flag salute instead of reciting the Pledge of Allegiance. *Holloman*, 370 F.3d at 1260-61. The student "was punished for the substance of his unpatriotic views rather than an alleged disruption of class." *Id.* at 1281. And prior Supreme Court and Eleventh Circuit caselaw held that the First Amendment prohibited such viewpoint discrimination, regardless of whether the plaintiff's speech was protected. *Id.* at 1280-81. Based on *Holloman*, school teachers should know that the First Amendment prohibits them from punishing a student because of his unpalatable viewpoints. *Id.*

But *Holloman* does not map onto the facts here. Plaintiffs do not allege that they were punished for their anticipated viewpoint or that any Individual Defendant specifically prohibited them from speaking. Plaintiffs' case instead hinges on a question of parliamentary procedure at school board meetings.

And there is plenty of room for debate about what the controlling procedure was here. Policy BCBI is silent about where public-comment sign-ups occur. [*See generally* Doc. 1-1.] Plaintiffs acknowledge that CCSD has, in the past, held sign-ups in different locations and through different means. [Doc. 1 ¶ 23.] And though prospective speakers "sometimes" arrive hours before a board meeting to sign up [*id.* ¶ 24], Plaintiffs do not allege that CCSD has formally approved or endorsed that protocol. For instance, they do not allege that CCSD officials have placed signage designating any particular location as the line-up spot. [*See generally* Doc. 1.] Nor do they propose any temporal limit on when they think the sign-up line can begin forming. [*See generally* Doc. 1.]

Yet Plaintiffs insist that they secured their spot in the public-comment sign-up line by arriving ninety minutes before the sign-up process even began and gathering where they thought the sign-up process would take place. So despite CCSD never adopting such a practice, Plaintiffs contend they secured their spot in line, based solely on their subjective expectations of where sign-ups would occur. Based on that premise, they claim CCSD violated their First Amendment rights just by moving the sign-up process to a mutually accessible location outside.

Even if one assumed that novel theory had any merit, there is nothing about *Holloman* or the text of the First Amendment itself that would have alerted the Individual Defendants that their alleged actions amounted to unconstitutional

viewpoint discrimination. There is nothing controversial about the proposition that viewpoint discrimination violates the First Amendment. But that does not mean that a plaintiff can defeat qualified immunity simply by accusing the defendant of engaging in viewpoint discrimination.

In examining qualified immunity defenses, both the U.S. Supreme Court and the Eleventh Circuit have repeatedly rejected such generalized formulations of the law. *See, e.g.*, *Reichle v. Howards*, 566 U.S. 658, 665 (2012) ("[A]s a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for his speech. But we have previously explained that the rights allegedly violated must be established not as a broad general proposition but in a particularized sense so that the contours of the right are clear to a reasonable official." (cleaned up).); *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) (holding that the principle that "the act of retaliation for the exercise of constitutional rights is clearly established as a violation" was too broad).[1]

---

[1] Other jurisdictions agree. *See, e.g.*, *Morgan v. Swanson*, 755 F.3d 757, 761 (5th Cir. 2014) (per curiam) (describing the proposition that "regardless of forum, viewpoint discrimination regarding private speech is unconstitutional" as "exactly the kind of proposition that will not suffice for the purposes of qualified immunity analysis, as it simply does not provide the official with any sense of what is permissible under a certain set of facts"); *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) ("Plaintiffs are correct that the government usually cannot discriminate against a speaker based upon that speaker's viewpoint. But in qualified immunity cases, except in the most obvious cases, broad, general propositions of law are insufficient to suggest clearly established law.")

And failing to hew to those demanding standards is reversible error. *See White v. Pauly*, 580 U.S. 73, 78 (2017) (reversing denial of qualified immunity because court "erred by defining the clearly established law at too high a level of generality, in contravention of this Court's precedent").

**b. The Court erroneously invoked the second "obvious clarity" method.**

In denying the Individual Defendants' qualified immunity, the Court relied on the second "obvious clarity" method, reasoning "that there exists a broader clearly established principle . . . that viewpoint-driven prior restraints on speech are so clearly unlawful that no reasonable government official could believe otherwise." [Doc. 26 at 19 (cleaned up).] But that legal proposition is too abstract to have given the Individual Defendants' fair warning that their alleged conduct infringed on that right.

Under the qualified immunity doctrine, it is theoretically possible for a broader legal principle from pre-existing caselaw to delineate the unconstitutionality of certain government actions such that it controls the "novel facts" of a later case. *Gaines*, 871 F.3d at 1209. But "[i]f a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question." *Crocker*, 995 F.3d at 1240. "[P]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Gaines*, 871 F.3d at 1209. (cleaned up). "A reasonable official's awareness of the existence of an abstract right

does not equate to knowledge that *his* conduct infringes that right." *Id.* (emphasis in original) (cleaned up).

Some constitutional protections are more straight-forward, less fact-intensive, and therefore lend themselves more readily to "obvious clarity" cases. For instance, in *Hope v. Pelzer*, the Supreme Court held that prison guards "obvious[ly]" violated the Eighth Amendment's prohibition on cruel and unusual punishment when they handcuffed inmates to a hitching post for extended periods, in the hot sun, as a means of coercing prison labor. 536 U.S. 730, 737-38 (2002). The practice was "obvious[ly] cruel," "antithetical to human dignity," "painful," "degrading," "dangerous," and "not done of necessity but as punishment for prior conduct." *Id.* at 744-45. There were prior DOJ reports condemning the practice and opining that it was unconstitutional. *Id.* at Id. And a prior, binding case had held that it likely would have violated the Eighth Amendment if guards had withheld drinking water from inmates as a punishment for refusing to work. *Id.* at 743. Under those circumstances, any reasonable prison guard would have known that the type of hitching alleged here (*i.e.*, to coerce labor) violated the Eighth Amendment, even though no prior case had specifically so held. *Id.* at 747-48.

In other words, given what we know about the Eighth Amendment and basic human decency, we didn't need an earlier case to tell us that the hitching practices at issue in *Hope* were cruel and unusual. After all, the Eighth Amendment is fairly

straight-forward in its application.

In contrast, the First Amendment is more fraught with complexity, defying most attempts to divine "obvious" constitutional determinations from broader principles of law. *Gaines*, 871 F.3d at 1210. For instance, everyone knows that the First Amendment generally protects a citizen's right to film law enforcement activities in public places. *Crocker*, 995 F.3d at 1240. But that broadly established principle does not mean a plaintiff can pierce qualified immunity just by alleging that a police officer infringed on his right to film police. *Id.* at 1240-41.

In *Crocker v. Beatty*, that was the issue the Eleventh Circuit confronted. *Id.* There, a sheriff's deputy confiscated the plaintiff's phone to prevent him from recording law enforcement activities at the scene of a fatal traffic crash. *Id.* at 1237. Decades prior, the Eleventh Circuit had held that "the First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest" and "to photograph or videotape police conduct," "subject to reasonable time, manner and place restrictions. . . ." *Id.* at 1240 (citing *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000).) But it was "decidedly *not* 'obvious' that [this] general rule applie[d] to the specific situation in question" there. *Id.* at 1240-41 (emphasis in original). The prior case involved a limited public forum, so it was debatable whether the broad principle applied to a public place like the roadside. *Id.* at 1242. On top of that, there

were state statutes that arguably prohibited the plaintiff from parking where he did. *Id.* Given those novel facts, it was at least reasonably debatable whether a reasonable law enforcement officer would have known that confiscating the plaintiff's phone under these circumstances violated the First Amendment. *Id.* at 1243.

With those principles in mind, the "obvious clarity" methods do not apply here. As discussed above, because *Holloman* arose out of a wildly different factual context (corporal punishment for a student's political views), any generalized principle extracted from that case cannot apply with "obvious clarity" to the alleged facts here (moving the public-comment sign-up process to a mutually accessible outdoor location). Based on *Holloman*, a reasonable school district official might have known that it would violate the First Amendment to physically punish Plaintiffs over their hostile viewpoints, but nothing in *Holloman* touched on how public-comment sign-up procedures should be administered.

The Individual Defendants understand and respect that this Court no doubt disagrees with their arguments about the "obviousness" of this matter. But the Eleventh Circuit's emphasis on how rarely the "obvious clarity" methods apply, nobody could say that the Individual Defendants' appeal of the qualified immunity ruling is "frivolous." Under that low standard, this Court should stay proceedings until the Eleventh Circuit fully resolves all issues on appeal.

**c. The Court relied on post-violation case law to determine that the unlawfulness of the Individual Defendants' alleged acts was "clearly established" at the time of the alleged violation.**

To overcome qualified immunity, the plaintiff must show that the unlawfulness of the defendant's alleged acts was "clearly established" *at the time of the alleged violation*. *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1232 (11th Cir. 2020). As discussed above, the "obvious clarity" methods do not apply here, so Plaintiffs must rely on a materially similar, controlling case. If the plaintiff relies on a materially similar, controlling case, that case must have "pre-exist[ed]" the defendant's alleged violation. *Cantu*, 974 F.3d at 1232. So here, any such case here must have been decided before September 14, 2023: the date of the board meeting at issue.

Yet this Court relied heavily on *Huggins v. School District of Manatee County*, 151 F.4th 1268, 1279 n.7 (11th Cir. 2025), a case that was not decided until two years later. [Doc. 26 at 20-21.] So *Huggins* did not supply the "clearly established law" needed to pierce the Individual Defendants' qualified immunity.

And even if *Huggins* had been decided before the subject board meeting, it was still too factually dissimilar to have alerted the Individual Defendants that *their* alleged acts constituted viewpoint discrimination. In *Huggins*, a plaintiff sued a school district and several school district officials after the superintendent directed law enforcement officers to remove him from a board meeting, under threat of arrest,

based on his hostile viewpoints toward the school board. 151 F.4th at 1276. The Eleventh Circuit examined whether two groups of defendants had qualified immunity from the plaintiff's claims of viewpoint discrimination: (i) the superintendent; and (ii) the chief of security and police officer who carried out the superintendent's directives. *Id.* at 1276, 1278-1284. Only the superintendent lacked qualified immunity. *Id.* at 1278-84.

The Eleventh Circuit reached that decision at step one of the qualified immunity analysis, finding that the superintendent had "not shown that directing the removal of a community member from a Board meeting falls within the scope of her discretionary authority." *Id.* at 1278. In other words, the court did not even reach the question of "clearly established law," because the superintendent had shown no general entitlement to qualified immunity in the first instance. *Id.* But even if this Court considered it "clearly established" that the superintendent's conduct violated the First Amendment, that proposition still provides little guidance here, because the superintendent's actions resemble nothing the Individual Defendants allegedly did here. There is a world of difference between: (1) physically removing somebody from a board meeting because of that person's hostile viewpoints; and (2) moving the public-comment sign-up process outside without giving prospective speakers the amount of notice they desired.

Moreover, the Eleventh Circuit enforced the remaining school district

officials' qualified immunity, at the pleading stage. *Id.* at 1283-85. Though the plaintiff alleged that the chief of security and police officer "intended to restrict [the plaintiff's] speech or retaliate against him" because of his hostile viewpoints, the plaintiff had not plausibly alleged facts supporting such an inference. *Id.* at 1283. The court did not impute the superintendent's alleged, viewpoint-driven motive to the school district officials who were simply carrying out her directives. *Id.* at 1284.

So if anything, *Huggins* confirms that merely accusing school district officials of discriminating against prospective speakers based on viewpoint is not enough to overcome their qualified immunity, no matter how uncontroversial that general principle of law is. By crediting Plaintiffs' conclusory allegations that Defendants violated that generalized proposition of law, this Court deviated from the Supreme Court and Eleventh Circuit's qualified immunity standards.

***

For all these reasons, the Individual Defendants' qualified immunity appeal is nonfrivolous, entitling them to a stay pending resolution of their interlocutory appeal.

**B. The stay should also extend to CCSD.**

CCSD has appealed this Court's denial of its motion to dismiss as to Plaintiff's First Amendment claim. The Eleventh Circuit has discretion to consider a school district's appeal alongside a qualified immunity appeal under the pendent appellate

jurisdiction doctrine. *See Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1297 (11th Cir. 2021) (recognizing that the court may address nonappealable orders that "implicate the same facts and the same law" as an appealable order) (citation and punctuation omitted). Usually, the Eleventh Circuit exercises that discretion when it decides the qualified immunity appeal on the first prong—*i.e.*, whether the plaintiff established a violation of federal law. *See Spencer v. Benison*, 5 F.4th 1222, 1234 (11th Cir. 2021). For the reasons discussed in the motion to dismiss, both the Individual Defendants and CCSD have a colorable argument that, under the first prong of the qualified immunity analysis, Plaintiffs have not plausibly alleged a violation of their constitutional rights. The Eleventh Circuit therefore has discretion to consider that overlapping question on appeal. And if the Eleventh Circuit ultimately decides that issue in favor of Defendants, it will dispose of all claims. It would therefore promote judicial efficiency to stay all proceedings until we see how the Eleventh Circuit rules on that issue.

Even if the Eleventh Circuit declines to exercise pendent appellate jurisdiction over CCSD's appeal, it still makes sense to stay proceedings until the Eleventh Circuit rules on the Individual Defendants' qualified immunity, for two main reasons.

***First***, that ruling would be instructive to this Court going forward. If the Eleventh Circuit holds that Plaintiffs have not plausibly alleged a First Amendment

violation by the Individual Defendants, then that ruling would make the continued viability of Plaintiffs' claims against CCSD dubious at best. Plaintiffs claim that CCSD violated their First Amendment rights, based on the alleged acts of the Individual Defendants. So if the Individual Defendants' alleged acts were constitutional, then Plaintiffs will be hard-pressed to continue maintaining their claims against CCSD.

***Second***, if this Court were to allow discovery to proceed as to CCSD, it would deprive the Individual Defendants of a main benefit and purpose of qualified immunity. Quite simply, commencing litigation against CCSD would necessarily subject the officials claiming qualified immunity to the burdens of litigation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 685-86 (2009) ("[W]hen discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery."). If Plaintiffs could invoke the Court's compulsory discovery process, Plaintiffs would likely focus their efforts on deposing the Individual Defendants or serving Rule 45 subpoenas on the Individual Defendants, as though they were a nonparty. In other words, even if Plaintiffs could not use the tools of party discovery against the Individual Defendants—such as written discovery under Rules 33, 34, or

36—their party discovery against CCSD would still burden the Individual Defendants. In doing so, Plaintiffs would frustrate one of the key benefits of qualified immunity.

On the other hand, granting a stay would conserve judicial resources and prevent piecemeal litigation. *See K.M. v. Alabama Dep't of Youth Servs.*, 209 F.R.D. 493, 495 (M.D. Ala. 2002), *aff'd sub. nom. K.M. v. AL Dep't of Youth Servs.*, 73 F. App'x 386 (11th Cir. 2003) (staying discovery as to non-appealing parties and claims pending resolution of qualified immunity appeal because "the danger of wasting judicial resources through piecemeal [discovery] … far outweighs any advantage for any of the parties"); *Thomas v. City of Jacksonville*, No. 3:13-CV-776-J-39PDB, 2015 WL 13439753, at *1 (M.D. Fla. Feb. 18, 2015) ("the Court determines that a stay of this action [for City of Jacksonville] will conserve judicial resources until the Eleventh Circuit determines whether Officer Edwards is entitled to qualified immunity"). For these reasons, district courts across the circuit routinely stay proceedings for a government entity pending resolution of an official's qualified immunity appeal. *See K.M., Thomas; Sosa v. Hames*, No. 05-23079-CIV, 2006 WL 1284927, at *1 (S.D. Fla. May 3, 2006); *WBY, Inc. v. DeKalb Cty., Georgia*, 2016 WL 7334648, at *4 (N.D. Ga. Apr. 11, 2016); *Sheba Ethiopian Rest., Inc. v. DeKalb County*, 1:17CV04400-WMR (N.D. Ga. Sept. 20, 2021); *Fleming v. United States*, No. 4:20-CV-545-WS/MJF, 2023 WL 3510429, at *2 (N.D. Fla. Apr. 26, 2023),

*report and recommendation adopted*, No. 4:20CV545-WS/MJF, 2023 WL 3509707 (N.D. Fla. May 17, 2023).

Accordingly, Defendants respectfully request that this Court stay proceedings pending appeal.

## III. CONCLUSION.

In sum, a stay avoids duplicative proceedings, preserves qualified immunity, and ensures the Eleventh Circuit can resolve threshold questions before this Court and the parties expend further resources. For those reasons, Defendants request that this Court stay proceedings in this case pending final resolution of Defendants' interlocutory appeal.

This 4th day of May, 2026.

*/s/ Jeffrey R. Daniel*
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Defendants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
Telephone: 678.690.5750
Facsimile: 404.869.6972
jeffdaniel@parkerpoe.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(C).

This 4th day of May, 2026.

*/s/ Jeffrey R. Daniel*
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Defendants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
Telephone: 678.690.5750
Facsimile: 404.869.6972
jeffdaniel@parkerpoe.com

## CERTIFICATE OF SERVICE

I certify that I have this day I filed the foregoing DEFENDANTS' MOTION TO STAY PROCEEDINGS AND SUPPORTING MEMORANDUM OF LAW with the Clerk of Court using the CM/ECF electronic filing system, which will send an electronic copy to:


Gerry Weber, Esq.
THE WEBER LAW OFFICES
PO Box 5391
Atlanta, GA 31107
wgerryweber@gmail.com

Craig Goodmark, Esq.
GOODMARK LAW FIRM
1425-A Dutch Valley Place
Suite A
Atlanta, GA 30324
cgoodmark@gmail.com


This 4th day of May, 2026.


*/s/ Jeffrey R. Daniel*
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Defendants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
Telephone: 678.690.5750
Facsimile: 404.869.6972
jeffdaniel@parkerpoe.com